NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY vs. THE STATE.

*October 30—December 7, 1915.*
*May 27—June 13, 1916.*

*Constitutional law: Supreme court: Original jurisdiction: Actions against the state: Equal protection of the laws: Taxation of life insurance companies: License fees: Classification: Interstate commerce: Investment business of insurance company: Burdening by state law: Statute construed: Interest receipts from policy loans are not "premiums:" Liability to policyholders not an "unconditional debt:" Arbitrary discrimination.*

1. Under sec. 3, art. VII, Const., providing that "the supreme court, *except in cases otherwise provided in this constitution,* shall have appellate jurisdiction only," and sec. 27, art. IV, Const., providing that "the legislature shall direct by law in what manner and in what courts suits may be brought against the state," the legislature had power—by sec. 3200, Stats.—to designate the supreme court as the court in which such suits might be brought. *Dickson v. State,* 1 Wis. 122, followed.

2. A corporation is a person within the meaning of the Fourteenth amendment to the federal constitution, and under that amendment a state cannot discriminate against its own citizens and in favor of citizens of other states any more than it can do the reverse.

3. The Fourteenth amendment does not prevent a state from changing its system of taxation in all proper and reasonable ways, nor

from allowing exemptions, nor from imposing specific taxes upon different trades or professions, nor from classifying property for taxation so long as the classification does not invade rights secured by the federal constitution.

4. It is within the power of the state to impose upon life insurance companies occupation taxes in the shape of license fees in lieu of other taxes.

5. The license fees imposed upon life insurance companies by sec. 1220, Stats. 1911 (sec. 51.32, Stats. 1913), are privilege or occupation taxes; and while not subject to the provision in sec. 1, art. VIII, Const., that "the rule of taxation shall be uniform," they are subject to the general equality clauses of the state constitution and to the clause in the Fourteenth amendment Const. of U. S. guaranteeing "equal protection of the laws."

6. A classification of life insurance companies according to which license fees of different amounts are exacted must be founded upon real differences of situation and condition affording rational grounds for the difference in treatment.

7. A classification pursuant to which, in lieu of all other state taxes except taxes on real estate, domestic level-premium life insurance companies are required to pay much larger license fees than are exacted from foreign level-premium companies, is justified by the location for taxing purposes of their vast reserves—those of the domestic companies being taxable in this state while those of the foreign companies are, practically, not so taxable and are presumably subjected to just and adequate taxation in their respective domiciles.

8. So, also, a classification under which license fees are exacted from level-premium life insurance companies but not from fraternal benefit associations having lodge organizations is justified by real and substantial differences.

9. The reasons which justify a classification under which domestic level-premium companies pay higher license fees than foreign level-premium companies apply with greater force and justify a similar discrimination between domestic level-premium companies and foreign assessment or stipulated premium companies.

10. The business of insurance, i. e. issuing policies, collecting premiums, and paying losses, is not interstate commerce; but whether that branch of the business of a life insurance company which consists in loaning money upon real estate or other security to citizens of other states is to be deemed a mere incident of the insurance business or should be considered as a separate business and as a form of interstate commerce, is not decided.

11. Assuming that the foreign investment business done by a domestic life insurance company constitutes interstate commerce, no

burden is placed upon such commerce by the state law (sec. 1220, Stats. 1911: sec. 51.32, Stats. 1913) requiring the company to pay as a license fee a certain percentage of its gross income (excepting therefrom rentals of real estate on which the taxes have been paid, and premiums collected outside the state on policies held by nonresidents) for transacting the business of life insurance in this state. The tax in such case is not levied upon the foreign investment business nor on the receipts therefrom, but on the business of life insurance, and said receipts are simply used in measuring in part the amount of the tax.

12. When the state exercises its legitimate and rightful power of taxation of an occupation or privilege, it may rightfully measure that taxation either by property or the receipts from property neither of which are in themselves taxable.

13. Although a claim presented to the legislature for recovery of license fees paid by a life insurance company was based chiefly on the contention that the whole tax was invalid because of the unconstitutionality of the law under which it was exacted, yet the further distinct assertion therein that, even if the law were to be held constitutional, portions of the amount collected were illegal and should be refunded, was sufficient under sec. 3200, Stats., to give this court jurisdiction of that part of the claim.

14. Receipts of interest on premium notes and on policy loans or liens constitute a part of the gross income of a domestic level-premium life insurance company, upon which, under sec. 1220, Stats. 1911 (sec. 51.32, Stats. 1913), the three per cent. license fee is to be calculated. The interest on policy loans made to nonresident policyholders, although it may possess some characteristics of premiums, is not a part of the "premiums" collected outside of the state on policies held by nonresidents, within the meaning of said section.

15. A life insurance company's liability to policyholders, i. e. the present value of its outstanding policies valued as required by law, is not an "unconditional debt" within the meaning of our former statutes exempting from taxation so much of the securities and credits of a taxpayer as should "equal the amount of bona fide and unconditional debts by him owing."

16. The disparity between the tax burden of the plaintiff insurance company under the license system and that which it would bear if taxed under the income taxation system or the former personal property taxation system is not shown by the complaint in this case to be so great that the statute imposing license fees should be condemned as arbitrarily discriminatory.

   TIMLIN, J., dissents.

ACTION brought originally in the supreme court under the authority of sec. 3200, Stats.

For the plaintiff there was a brief by *Geo. H. Noyes,* counsel, a reply brief by *Geo. H. Noyes,* attorney, and *John M. Olin* and *Byron H. Stebbins,* of counsel, and a supplemental reply brief by *H. L. Butler,* of counsel; and the cause was argued orally by *Mr. Butler* and *Mr. Stebbins.*

For the defendant there was a brief by the *Attorney General* and *Walter Drew,* deputy attorney general, and oral argument by *Mr. Drew.*

The following opinions were filed December 7, 1915:

WINSLOW, C. J. The plaintiff, a domestic mutual life insurance corporation, doing business on the level-premium plan, brings action in this court against the state to recover license taxes paid to the state under protest amounting to $482,193.23 in 1912 and $505,643.22 in 1913.

The license taxes were levied under sec. 1220, Stats. 1911 (being sec. 51.32, Stats. 1913), and the plaintiff's claim is that the statute is void (1) because it denies the equal protection of the laws guaranteed by the state constitution and by the Fourteenth amendment to the federal constitution, and (2) because it unlawfully interferes with interstate commerce. The complaint shows that the claims were duly presented to the state legislature and disallowed. The state demurs (1) because this court has no jurisdiction of the defendant's person, (2) because it has no jurisdiction of the subject of the action, and (3) because the complaint does not state a cause of action.

In support of the first two grounds of demurrer it is argued that sec. 3200 of the Statutes, under the terms of which this action is brought by original action in this court, is void because it attempts to confer original jurisdiction upon this court in violation of sec. 3 of art. VII of the state constitution,

the provisions of which, so far as material to this inquiry, are that "the supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only."

It is sufficient to say in answer to this objection that sec. 27 of art. IV of the constitution provides that "the legislature shall direct by law in what manner and in what courts suits may be brought against the state," and that it was decided by this court in 1853 (*Dickson v. State,* 1 Wis. 122) that this section gave power to the legislature to designate the supreme court as the court in which such suits might be brought, such designation being considered as one of the exceptions referred to in sec. 3 of art. VII.

This decision has never been overruled or questioned. It directly sustained the constitutionality of ch. 249 of the Laws of 1850, which has been upon our statute books ever since, and with unsubstantial changes now appears as secs. 3200–3203 of the Statutes. This decision has also been uniformly recognized in numerous instances by all departments of the state government, legislative, executive, and judicial, as correctly construing the constitution from the time of its rendition up to the present time, a period of more than sixty years. To overrule it now would be hardly permissible even if we were convinced (which we are not) that it was incorrect as an original proposition.

The law in question provides in substance that every company transacting the business of life insurance in this state (except fraternal societies having lodge organizations and insuring only their own members) shall annually pay as license fees for transacting such business and in lieu of all other taxes, except taxes on real estate, the following amounts:

Domestic level-premium or old-line companies *three per centum* of the gross income for the year, excepting therefrom rentals of real estate on which the taxes have been paid, and premiums collected outside the state on policies held by nonresidents;

Foreign level-premium or old-line companies $300, except that whenever the law of the foreign company's domicile requires a larger license fee or tax to be paid by an outside company as a condition for the issuance of a license, then such foreign company shall pay the same fee or tax for a license permitting it to do business in this state;

Stipulated premium companies, foreign or domestic, $300;

Assessment companies, foreign or domestic, and fraternal associations having no lodge organizations, $300;

Fraternal associations having lodge organizations and insuring only their own members, nothing.

The plaintiff's first claim is that this law denies to it the equal protection of the laws because it makes arbitrary discrimination (1) as between it and foreign level-premium companies, (2) as between level-premium companies and fraternal insurance organizations, and (3) as between domestic level-premium companies and assessment and stipulated premium companies.

The plaintiff's second claim is that the law unlawfully hampers and interferes with interstate commerce.

These claims will be discussed in their order.

1. Under this head the most serious contention doubtless is the contention that there is arbitrary and illegal discrimination between the plaintiff and foreign companies of the same class, *i. e.* companies doing life insurance business in this state on the level-premium plan. The plaintiff, a domestic corporation, is required to pay for the privilege of doing business in this state a license fee amounting to three per centum of its gross receipts (certain classes of receipts being excepted), while foreign corporations doing business upon the same plan are required to pay only $300 per year (except in cases where the retaliatory clause is called into operation) for the same privilege.

It is clear that this so-called license fee is a privilege or occupation tax, and that, while it is not subject to that clause of

the state constitution which requires the taxation of property to be uniform (sec. 1, art. VIII), it is subject to the general equality clauses of the state constitution and to the clause guaranteeing the "equal protection of the laws" contained in the Fourteenth amendment to the federal constitution. It is clear also that this means that there can be no arbitrary or whimsical classification, but that there may be classification founded upon real differences of situation and condition affording rational grounds for the difference in treatment. *Black v. State,* 113 Wis. 205, 219, 89 N. W. 522; *Nunnemacher v. State,* 129 Wis. 190, 220, 108 N. W. 627; *Beals v. State,* 139 Wis. 544, 557, 121 N. W. 347; *Connolly v. Union S. P. Co.* 184 U. S. 540, 559, 560, 22 Sup. Ct. 431.

The disparity between the annual license fee required of domestic companies by the law in question and the fee required of foreign companies is admittedly very great, and the question arising is simply whether there is any substantial difference, other than the difference between foreign and domestic corporations, which differentiates the two classes and which justifies such great difference in treatment.

The question is by no means an easy one. A corporation is a person within the meaning of the Fourteenth amendment, and a state cannot under that amendment discriminate against its own citizens and in favor of citizens of other states any more than it can do the reverse. *Yick Wo v. Hopkins,* 118 U. S. 356, 6 Sup. Ct. 1064; *State v. Hoyt,* 71 Vt. 59, 42 Atl. 973. Every *person,* whatever his citizenship, is protected against unequal laws.

On the face of it this law seems to allow foreign life insurance companies to do business in this state upon payment of a mere nominal fee, while exacting from domestic companies for the same privilege a very large fee. Are there any real differences between the two classes which bear a just and proper relation to the attempted classification and justify this difference of treatment? If there are such differences the

law may doubtless be justified so far as this objection is con-
cerned, for it is quite well established that the Fourteenth
amendment does not prevent a state from changing its system
of taxation in all proper and reasonable ways, nor from al-
lowing exemptions, nor from imposing different specific taxes
upon different trades or professions, nor from classifying
property for taxation so long as the classification does not in-
vade rights secured by the federal constitution. *Bell's Gap
R. Co. v. Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533; *Con-
nolly v. Union S. P. Co., supra.*

The question whether there are substantial differences of
condition reasonably suggesting the propriety of difference of
treatment is primarily a legislative question, and the legislative
judgment thereon is not to be disturbed by the courts unless
legislative action has clearly passed the boundaries of reason.
Given the differences of condition above referred to and the
field of legislative action is very broad.   The legislative judg-
ment is not to be interfered with merely because the judicial
mind might reach a different conclusion as to the policy or
wisdom of the law nor unless the court can confidently say
that no reasonable ground can be discovered to support the
classification.

In approaching this question it is important to note at the
outset that the license tax in question is levied *in lieu* of all
other state taxes except taxes on real estate owned by the com-
pany.   It covers all the contributions which the state de-
mands from the company or its business except real-estate
taxes, which are relatively small in amount.   It is common
knowledge that all of the great level-premium insurance com-
panies of the present day have vast reserve funds, to protect
their liabilities on policies, running up into the hundreds of
millions of dollars, and that these reserves are invested in in-
terest-bearing securities, of which real-estate loans secured by
mortgage generally form the largest part.   In the complaint
in the present case it appears that on December 31, 1911,

the plaintiff had outstanding loans secured by real-estate mortgages amounting to $153,562,654.39, of which only $5,654,369.10 covered real estate in Wisconsin. It also appears that the plaintiff's income from real-estate mortgages for the year ending on said last named date amounted to $7,446,393.10 and its income from bonds to $3,172,489.58. These securities are all credits, *i. e.* personal property of an intangible character, the situs of which for the purposes of taxation is in this state at the residence of the corporation.

The power of the state under the constitution to levy occupation taxes in the shape of license fees in lieu of other taxes cannot now be questioned. *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 589, 108 N. W. 557; *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627. Having determined on the license system of taxation for all life insurance corporations, the state faced this situation: on one hand were the domestic level-premium companies (of which the plaintiff is by far the most conspicuous example), having their reserves invested in securities or credits, all of which were not only taxable in Wisconsin but should, in justice to other taxpayers, contribute to the expenses of the government which created and protects their owners; and on the other hand were the foreign level-premium companies, also having great reserves, practically none of which were taxable in Wisconsin and which were presumably subjected to just and adequate taxation in their respective domiciles. The essential difference was not the difference in residence but the difference in the location for taxing purposes of the reserves. This difference is certainly a very real one, germane to the subject of license-fee taxation, and it plainly suggests, if it does not indeed demand, some substantial difference of treatment in the matter of the amount of the fees exacted. It would be indefensible to subject both classes to the merely nominal fee of $300, thus allowing the great reserves of the local companies to escape taxation entirely, and it would be equally indefensible to exact of

both classes a fee large enough to accomplish just taxation of the domestic company. The first course would practically exempt from taxation a very large volume of the state's taxable property, thus increasing the burdens of all other taxpayers, and the second course would probably bar out every foreign life insurance company from the state, and either course would manifestly give to the domestic companies a very great advantage over foreign companies doing the same business.

Plainly, the only course which could be followed, if just taxation were to be approximated under the license system of taxation, was a course which should in some way compel the domestic company to make a fair contribution to the support of its home government, while recognizing and allowing for the fact that presumably every foreign company is compelled by its home state to do substantially the same thing.

Whether this be done by personal property taxation, by income taxation, or by license-fee taxation was, we think, a question for the state to decide. We are unable to say that the state has not acted within the bounds of reason in fixing the license fees in the present case. It seems quite certain that a personal property tax would have exacted far larger contributions from the plaintiff to the public revenues than the license fee provided by this law.

It is not to be expected that any precedent exists exactly on all-fours with the present case, but we think it clear that the principle upon which the classification in question is based has been approved in a number of cases decided by the federal supreme court in recent years. *Pacific Exp. Co. v. Seibert,* 142 U. S. 339, 12 Sup. Ct. 250; *Kidd v. Alabama,* 188 U. S. 730, 23 Sup. Ct. 401; *Brown-Forman Co. v. Kentucky,* 217 U. S. 563, 30 Sup. Ct. 578.

The conclusion reached on this branch of the argument renders it unnecessary to consider at length the question whether the law is in any respect aided by the retaliatory feature. Retaliatory laws have been held valid by the fed-

eral supreme court (*Philadelphia F. Asso. v. New York,* 119 U. S. 110, 7 Sup. Ct. 108), and we find no necessity for considering the question as to the practical effect of that feature in the present law. Any effect which it may have must of course be in the direction of lessening the disparity in treatment of which the plaintiff complains in the present case.

This brings us to the contention that there is unlawful discrimination between level-premium companies and fraternal benefit associations having lodge organizations, which, under the terms of the law, are exempted from the payment of any license fees. We do not feel that we should be justified in consuming any considerable amount of time or space in meeting this contention.

That there is much difference of condition between the great level-premium company with its great reserves and the ordinary fraternal benefit association cannot be questioned. That the differences are such as to justify classification and difference of treatment so far as license taxation is concerned seems to us quite evident. The level-premium company is purely a business concern; the true fraternal benefit association is a banding together of many groups of neighbors primarily for social purposes, but with the further idea of rendering mutual help in misfortune, sickness, or death and inculcating the principles of brotherhood among the members. Such associations have no great expense account, they conduct the insurance feature of their organizations at comparatively small cost, and they have no such immense volume of reserve funds. Probably the lodge organization is their most marked differentiating characteristic. It is this characteristic which the legislature has chosen as decisive of their character, and we do not feel that we can say that the choice was made without reason. It avails not to say that there may be some instances where the lodge organization is almost or quite a pretense and the supposed fraternal association really approaches very closely to an insurance company. Nearly all classification possesses this defect. Individual cases near the border line

on either side often present no differences worthy of notice, but this does not invalidate the classification. It is the class, considered broadly as a class, which must possess the substantial differences suggesting the propriety of different legislative treatment, not every individual of the class. This principle is familiar.

This state has recognized the distinct and exceptional character of fraternal associations and treated them as forming a class which should be subject to its own legal code since 1889 and still continues to do so. Sec. 1956 *et seq.* Stats. The brief of the state informs us that the laws of forty-two states recognize the same distinction and that twenty-nine of these states have specified the lodge system as one of the distinguishing features of such organizations. We have not verified all of the citations, but have no doubt of their substantial accuracy. We see no reason to doubt that the differences between these organizations as a class and level-premium insurance companies as a class are so real and substantial as amply to justify classification. This conclusion receives support in the case of *German Alliance Ins. Co. v. Lewis,* 233 U. S. 389, 34 Sup. Ct. 612.

We now reach the alleged illegal discrimination between domestic level-premium companies on the one hand, and assessment and stipulated premium companies, whether foreign or domestic, on the other. The following statements from insurance writers are quoted with apparent approval in the plaintiff's brief:

"The assessment system . . . is that one under which, theoretically, the cost of the insurance is annually collected from the members by assessing on them the costs. In practice there have been so many modifications of this theory that it is difficult to characterize the assessment plan, but the essential idea in this system is that no reserve is collected." Gephart, Principles of Insurance, pp. 100, 101.

"For a long time they [assessment companies] were all agreed that a reserve was not merely unnecessary but useless and dangerous. But after a time the simple science of the

natural premium tables made it clear that, whether a society regarded it or not, there is a gradual and inevitable advance in the cost of insurance with the increase of hazard because of the advancing ages of the insured; and, consequently, several co-operative companies gave up the principle of 'pay as you go' and collected such amounts in excess of current expenses and losses as in the varying opinions of their managers would be likely to hold the premiums stable. The variety of views as to the cause of alterations in current cost and the mode of remedying them is indicated by various terms adopted to designate the reserve accumulations—emergency fund, guarantee fund, mortuary reserve fund, special reserve fund, and the like. This is a very great change from the original basis and utterly invalidates the narrow and specific definition of assessment insurance which has been given. The new definition must cover practically all forms of insurance which do not make compliance with legal reserve laws fundamental; in fact, such compliance or noncompliance may be made the shibboleth to distinguish the two forms of insurance." Dawson, Assessment Life Insurance, pp. 4, 5.

"The assessment companies . . . are less scientific in their operations. No mortality tables are used, no interest rates are assumed, and no technical reserves maintained. The original plan of the purely assessment companies was to wait until one or more losses had occurred and then levy an assessment sufficient to cover such loss or losses. This, however, proved uncertain and so annoying to the members that they invariably withdrew, the young and healthy withdrawing first. This left the old and decrepit to pay the consequent increasing assessments and finally to meet with disaster. A variety of methods have been tried to obviate this difficulty. In late years most of these associations have collected advance assessments in the form of stipulated premiums and have accumulated so-called 'reserves.' " Wisconsin Insurance Report, 1907 (Life and Casualty), 39, 40.

"A term [stipulated premium] somewhat vaguely applied to the premium charge of sundry assessment associations. Instead of irregular assessments, a stipulated amount yearly is charged, the same to remain level until found inadequate for the payment of increasing death losses, when an additional charge may be made. The original charge, the so-called 'stipulated premium,' varies in different associations according to the guess of the management. It serves the purpose

for a few years, but sooner or later proves inadequate, and must be increased in amount or an additional assessment must be made." Jackson, Definitions in Life Insurance, p. 24, No. 51.

It is quite apparent from these three excerpts that assessment insurance pure and simple, except so far as the fraternal orders are concerned, has broken down, and that experience has demonstrated that a premium plan having some resemblance at least to the level-premium plan must be adopted if assessment companies are to live. The legislature of Wisconsin recognized the inherent weaknesses of assessment insurance as early as 1899, and by ch. 270 of the laws of that year authorized the formation of companies on the stipulated premium plan and provided for the reincorporation of assessment associations or societies under the act. This act required the charge by such companies of net premiums calculated on mortality tables equal to that of yearly term insurance at the age of entry and increased at least twenty-five per cent. It also provided for the accumulation of certain reserves. This act was evidently not satisfactory and was repealed by ch. 121, Laws 1907. By ch. 447 of the laws of the same year two sections were added to the Statutes which are now numbered secs. 1955y—1 and 1955y—2.

The first of these sections provides that no life insurance company (other than fraternal associations) "which issues contracts, the performance of which is contingent upon the payment of assessments or calls made upon its members, shall do business within this state except *such companies or associations as are now authorized* to do business within this state *and which shall value* their assessment policies or certificates of membership as yearly renewal term policies according to the standard valuation of life insurance policies prescribed by the laws of this state." The section further provides for the details of the required valuation and also compels the company to keep a certain reserve.

By this section all assessment companies were forbidden to

do business in the state in the future except those which were lawfully doing business here at the time of the passage of the law and they were required to adopt the stipulated premium plan. It appears by the published reports of the insurance commissioner that at the time of the passage of this law (ch. 447, Laws 1907) and for some time prior thereto there were no domestic assessment companies doing business or licensed to do business in the state. The law inhibits them in the future, hence there is no such class as domestic assessment or stipulated premium companies and can be none.

There were but three foreign assessment companies doing business in the state in 1907 and there is said to be but one now. This company must, of course, be doing business on the stipulated premium plan and must constitute the entire class. The reasons already given for upholding classification as between domestic and foreign level-premium companies apply with greater force to the classification as between domestic level-premium and foreign assessment or stipulated premium companies.

2. Passing to the consideration of the question whether the statute imposes an unlawful burden on interstate commerce the argument is that, while the business of insurance, i. e. issuing policies, collecting premiums, and paying losses, is not interstate commerce (*New York L. Ins. Co. v. Deer Lodge Co.* 231 U. S. 495, 34 Sup. Ct. 167), the business of loaning money on real estate or other security to the citizens of other states is undoubtedly interstate commerce which is necessarily burdened by the tax in question. The investment business of the plaintiff is indeed a vast one considered by itself alone. It appears that the plaintiff in December, 1911, possessed nearly $150,000,000 worth of foreign mortgage loans, and between $70,000,000 and $80,000,000 worth of foreign bonds. The carrying on of such a business necessarily requires constant transmission from state to state of applications for loans, abstracts, notes, bonds, mortgages, policies, drafts, and other

papers, to say nothing of the employment of agents in the various states where the loans are made.

It is said that the foreign investment branch of the business is not interstate commerce because it is a mere necessary incident of, and cannot be considered apart from, the insurance business, which, as we have seen, is held by the federal supreme court not to be interstate commerce. The argument may be sound, but we do not pass upon it. We shall undertake no voyage of discovery on the sea of interstate commerce unless we are compelled to do so. That sea is a troubled one, full of rocks and shoals, as yet imperfectly charted. We do not find ourselves compelled to embark upon it in this case.

If, as argued by the plaintiff, the investment business be a separate business and a form of interstate commerce, the answer is that the law places no burden upon that business. It requires the payment of a license fee for transacting life insurance business in this state. The plaintiff is not required to transact this last named business; it may do so or not, as it pleases. If it does not do so, it may transact all the investment business which it desires to transact without paying any license fee under this law.

It is very well established by federal decisions that when the state exercises its legitimate and rightful power of taxation of an occupation or privilege it may rightfully measure that taxation either by property or the receipts from property neither of which are in themselves taxable. *Maine v. G. T. R. Co.* 142 U. S. 217, 12 Sup. Ct. 121, 163; *Flint v. Stone Tracy Co.* 220 U. S. 107, 31 Sup. Ct. 342; *Baltic M. Co. v. Massachusetts,* 231 U. S. 68, 34 Sup. Ct. 15. In the last cited case it is said in the opinion:

"It is the commerce itself which must not be burdened by state exactions which interfere with the exclusive federal authority over it. A resort to the receipts of property or capital employed in part at least in interstate commerce, when such receipts or capital are not taxed as such but are taken as

a mere measure of a tax of lawful authority within the state, has been sustained" (citing cases).

These cases seem to us decisive of the question here. The receipts from the foreign investment business are simply used as measuring in part the amount of the tax to be levied, not on that business nor on the receipts themselves, but on the business of life insurance conducted by the plaintiff, a subject of taxation which is unquestionably within the legitimate taxing power of the state.

3. A separate contention, affecting a part only of the tax collected, is yet to be considered.

It appears by the complaint that the total income of the company by which the license fee for the year ending December 31, 1911, was measured was $16,073,107.76, of which sum $2,163,808.84 consisted of interest on premium notes and policy loans or liens. Receipts of the same character, though differing somewhat in amount, were included in the income of the following year. The plaintiff's claim is that these receipts are not "income within the meaning of the law," and hence that a ratable proportion of the license fee paid should be recovered, irrespective of the result on the general question of the constitutionality of the law.

It appears that the so-called policy loans are made to policyholders by virtue of a clause in the policies which declares that, on request of the assured and upon sole security of the policy properly assigned, the company will advance, at a rate of interest not exceeding six per cent. per annum, an amount which, with interest, shall equal the cash surrender value of the policy. The argument is that, while these arrangements are called "loans," they are in fact but advance payments of amounts already owing to the policyholder and the so-called interest is simply an additional premium for continued insurance, and reliance is placed on the case of *New York L. Ins. Co. v. Assessors,* 158 Fed. 462, affirmed in *Orleans Parish v. New York L. Ins. Co.* 216 U. S. 517, 30 Sup. Ct. 385.

The state makes a preliminary objection to the considera-
tion of this claim to the effect that it has never been presented
·to the legislature and hence that the court, under sec. 3200,
Stats., has no jurisdiction to consider it.    Examination of the
claims presented to the legislature by the plaintiff, copies of
which are attached to the complaint, certainly show that the
invalidity of the whole tax by reason of the unconstitution-
ality of the law was the contention chiefly relied upon.    The
claims, however, both contained the distinct statement that
the tax complained of was "in excess of the amount legally
required" under the law in question, "portions of said amount
being derived from a percentage of amounts not constituting
taxable incomes of said company," and the claims also prayed
for refund of the amounts paid, "or such portions thereof as
may be ascertained the state was not entitled to receive."

We are not disposed to draw fine lines on this question.
While the plaintiff's claim did not go into details, it did cer-
tainly make the distinct assertion that there were portions of
the fee which were illegal and which it sought to recover
even if the law itself were to be held constitutional.

The plaintiff argues that, if these so-called interest pay-
ments be in fact premiums, they are premiums collected out-
side of the state on policies held by nonresidents and hence
are not part of the income made by the law the measure of
the taxation.

The complaint charges that "the proportionate part of the
business transacted by it through commercial intercourse with
residents of states other than Wisconsin was on December 1,
1911, approximately as follows:

"1. . . . . . . . . .

"2. . . . . . . . . .

"3. . . . . . . . . .

"4. Of the total amount of outstanding policy loans or ad-
vances more than 93 per cent."

For the purposes of the case we assume that this should be

construed as meaning that more than ninety-three per cent. of the policy loans are made to nonresidents of Wisconsin and hence that the payments of interest thereon are payments made outside of the state by nonresidents thereof. Even with this assumption we do not think the plaintiff's contention can be sustained.

In the case cited (*Orleans Parish v. New York L. Ins. Co.* 216 U. S. 517, 30 Sup. Ct. 385) the state legislature of Louisiana had passed a law attempting to tax a foreign insurance company on such policy loans as "credits" within the state. The trial court and the United States supreme court held that they were in fact but advance payments made by the insurance company, and that the so-called note given as evidence of the advance did not represent a debt because there was no debt created, and if no debt no credit.

Accepting this doctrine fully it nevertheless does not control this case. The question here is simply, What did the legislature mean by the words "gross income" and "premiums collected"?

If they used these words in their ordinary everyday sense (and there is nothing to show to the contrary), then the case cited has no appreciable bearing on the present controversy, because it must be admitted at once that the interest payments on policy loans have never been called premiums either by the plaintiff or by the public generally. If they are not "premiums" within the meaning of that word as used in the act they are necessarily a part of the "gross income" upon which the three per centum must be calculated.

The fact that in a logical sense they may possess more of the characteristics of premiums than of credits cuts no figure. The controlling question is whether the legislature intended to include them when it used the word "premiums." We are clearly of opinion that there was no such legislative thought.

Our conclusion is that the complaint states no cause of action.

*By the Court.*—Demurrer overruled as to the first and second grounds and sustained as to the third ground, and judgment ordered that complaint be dismissed on the merits with costs.

TIMLIN, J. (*dissenting*).    I am unable to agree with the disposition of this case made by the majority of the court and shall state as briefly as possible the grounds of my dissent.

1. The case of *International T. Co. v. Peterson,* 133 Wis. 302, 113 N. W. 730, was decided (not without misgiving) before the decision in *International T. Co. v. Pigg,* 217 U. S. 91, 30 Sup. Ct. 481.    The latter was a default case, and the *Peterson Case* also went by default in that high court.    But both cases were, after full argument, reviewed and confirmed in *New York L. Ins. Co. v. Deer Lodge Co.* 231 U. S. 495, 510, 34 Sup. Ct. 167, and it was there affirmed, contrary to the decision of this court in the *Peterson Case,* that the transmission, for a cash consideration paid or promised, of didactic written or printed discourse with explanatory diagrams and charts and with text-books, not for resale, from a person in one state to a person in another state, constituted interstate commerce.    These decisions were not alone precedents, they were also events in the development of federal and state relations under the federal constitution.    Another event which has since occurred is the enactment of the currency bill with its chain of banks and the necessity of a continual transmission of money, notes, bonds, and securities from one state to another.    So that, without going into any further specification or analysis of federal decisions, I think there can no longer be any doubt that carrying on a loan business involving the transmission of money and securities with the necessary correspondence, instructions, vouchers, and other writings, constitutes interstate commerce.    I do not know of any principle or precedent that would warrant us in saying that, because the plaintiff is an insurance company

whose business of delivering policies and collecting premiums is not commerce, no act done by it can be called commerce which would have been commerce if done by another. It seems to me that this would be a far-reaching restriction upon commerce and would introduce into a subject already too complicated a multitude of new and puzzling questions. Neither can I bring myself to believe that all transactions relating nearly or remotely to or even necessary to a business that is not commerce can be excluded from the meaning of the word "commerce." On the other hand, when I examine the question whether that part of plaintiff's business which consists of policy loans to nonresidents is the equivalent of collecting premiums, I am brought up against the difficulty that if it is it should have been excluded from the base of computation by the terms of the statute, and if it is not it is interstate commerce and should have been excluded. With reference to the other loans to nonresident persons, natural or corporate, I consider this business clearly interstate commerce. Therefore the income from the loan business carried on by the plaintiff with persons in other states, which forms the principal part of the base of computation upon which the amount of plaintiff's tax is computed, is the income of interstate commerce notwithstanding that plaintiff's business of delivering insurance policies and collecting premiums is not such commerce. *New York L. Ins. Co. v. Deer Lodge Co.* 231 U. S. 495, 34 Sup. Ct. 167. "Gross income" is the practical equivalent of gross receipts in such business.

2. I think the statute in question, sec. 1220, Stats. 1911, could and should have been so construed as to save it from all taint of unconstitutionality. This would, of course, permit some recovery by the plaintiff. Why does the statute exempt from the base upon which the amount of license fee is computed "premiums collected outside of the state of Wisconsin on policies held by nonresidents of the state of Wisconsin"? I do not think we can say with any confidence that it was be-

cause the state in which nonresidents of Wisconsin lived might, by excise or other form of taxation, reach such premiums and so cause double taxation, because in the parallel case of real estate situated outside of this state, and referred to in the same section, the income is exempted only in these cases where the corporation has paid the taxes assessed on the land, and further because the other state might as easily collect taxes on income from loans made and collected in that state as upon premiums so collected. If the premiums mentioned were thought by the legislature to be income derived from interstate commerce, that would be an argument in favor of the additional exemption of interest on loans collected in like manner, which is more surely interstate commerce. If it was considered that such premiums did not constitute an income from interstate commerce, why should the legislature relieve that which it believed was not interstate commerce and thus increase the burden upon the latter commerce by making the income from such interstate commerce a larger part of the base of computation? We are not to interpret the statute upon any theory that the words have no significance beyond the mere exemption of the specified premiums. But even if we so limit these words we would be called upon to include in the word "premiums" all collections outside of the state which by fair interpretation could be covered by the word "premiums," and if necessary to uphold the statute the comprehensive words "from all sources" should, upon approved rules of interpretation, be restrained so as to include only such sources as the state legislature had jurisdiction to include in the base of computation and so as to exclude income derived from interstate commerce. *Waters-Pierce Oil Co. v. Texas,* 177 U. S. 28, 20 Sup. Ct. 518; *Elwell v. Adder M. Co.* 136 Wis. 82, 116 N. W. 882.

3. With the interpretation given to this statute by the taxing officers of the state and approved by the majority opinion, I think, with all deference to that opinion, the statute is un-

constitutional as not only a burden upon, but a very plain attempt at, a kind of regulation of interstate commerce. The requirement of a license as a prerequisite to carrying on any business has always, I think, been considered one of the most effective and drastic modes of regulation. Failure to obtain the license, where one is lawfully required, outlaws the business and avoids the contracts made by him who fails to obtain the license and yet carries on business. When an excise tax is laid upon any business or occupation enforced by the requirement of a license and the license fee fixed by a percentage on the gross income, if that income is derived in whole or in great part from interstate commercial transactions, then the license fee necessarily increases with the increase of interstate commerce and diminishes with its diminution. It makes no difference in this result if the total gross income is derived from interstate commerce or only a substantial part of it. If it were conceded that the license fee in the case last stated was a prerequisite to engaging in interstate commerce, there could be no question, I think, but that such mode of measuring the amount and enforcing the payment of the excise tax would be a direct regulation of, or an unquestioned burden upon, interstate commerce. I think the majority opinion misapprehends the nature and effect of statutes requiring a license. Such statutes provide an effective mode of compelling the observance of regulations or the payment of a tax. They go to the remedy. The objectionable part of this statute is that which requires the plaintiff to pay three per cent. on its gross income. (Cases cited like *Maine v. G. T. R. Co.* 142 U. S. 217, 12 Sup. Ct. 121, 163, are obviously not in point here.) The legal effect of all such statutes is to say: "You are prohibited from carrying on the designated business or making the included contracts unless you pay a sum of money or submit to the specified regulations." The license is only the voucher which proves that the licensee has complied with the law. In the history of taxation in England there is

the story of old Isaac of York, who was induced to pay his taxes by pulling out one of his teeth every day until he paid.    The law might have said to him with the same effect: "By the payment of a sum equal to the tax demanded you can obtain a license which will authorize you to keep all your teeth."    If this law seeks to coerce the payment of a tax based upon gross income from interstate commerce by depriving the plaintiff of some other right, property, or privilege not connected with or a part of interstate commerce, then if this latter right, property, or privilege is valuable enough, the withholding of license and the consequent outlawry of plaintiff's domestic insurance business is as effective an interference with interstate commerce as if the statute expressly made the obtaining of license a condition precedent to carrying on the business of interstate commerce.    We are all familiar with the instances where the obligation to obtain a license before embarking in a specified business or calling is enforced by penalties or forfeitures from which the proposed licensee enjoys immunity if he pays the sum required for the license. So here, if plaintiff pays a percentage of its gross income from interstate commerce it may have a license to carry on its intrastate business, otherwise not and so otherwise subject to penalties.

4. I think the classification made by the act in question could be upheld if there were no questions of interstate commerce involved.

On January 11, 1916, upon motion of the plaintiff, the mandate was amended so as to allow an amended complaint to be received and filed.    The defendant demurred to such complaint on the ground that it did not state facts sufficient to constitute a cause of action.

For the plaintiff there was a brief by *Olin, Butler, Stebbins & Stroud,* and oral argument by *Harry L. Butler* and *Byron H. Stebbins.*

For the defendant there was a brief by the *Attorney General* and *Walter Drew,* deputy attorney general, and oral argument by *Mr. Drew.*

The following opinion was filed June 13, 1916:

WINSLOW, C. J.    Pursuant to leave of court an amended complaint has been filed in this action to which the state has demurred and argument has been had thereon.

While many new allegations have been added to the complaint we do not regard the situation as essentially changed. The new allegations, for the most part, merely add details to facts alleged in general terms in the original complaint or assumed to exist by the former decision.

We deem it necessary to refer to but two points which are urged by the plaintiff.

The great disparity between the taxation of foreign and domestic level-premium companies is very strongly urged and said to be so great as to be manifestly unconscionable and arbitrary.    In this connection it is argued that if a personal property tax had been levied on the plaintiff's reserve, consisting of securities and credits, there would have been deducted from the amount thereof, under the existing policy of the state with regard to the taxation of such property, its liabilities to policyholders, *i. e.* the present value of its outstanding policies valued as required by law, which is about ninety per cent. of the reserve.    It is also argued that if the plaintiff had been subjected to income taxation under the state law it would have paid much less than under the three per cent. license fee requirement.

We do not regard either contention as well founded.    Our statutes governing the taxation of securities and credits for many years provided that there should be exempted from taxation so much thereof as "shall equal the amount of *bona fide and unconditional* debts by him owing."    This provision was repealed by the Income Tax Law, which marked the abandon-

ment of the attempt to levy personal property taxes upon that species of property.    Ch. 658, Laws 1911.

It seems entirely clear that the liability to policyholders which the plaintiff refers to is not in any sense an "unconditional debt," and as the policy of the state has never extended the exemption to any liability short of an unconditional debt we are unable to see any sound basis for the argument made.

As to the contention that if the plaintiff were taxed under the income tax system its tax burden would be far less than under the present license system, we shall not attempt to go into the arguments and figures presented in detail.    It is sufficient to say that we do not think it appears from the allegations of the amended complaint that the plaintiff now pays substantially greater sums than it would pay under either the income taxation system or the former personal property taxation system.

At all events there does not affirmatively appear to be any such disparity as would condemn the law as arbitrarily discriminatory.

The interstate commerce feature of the case is reargued and the recent case of *Kansas City, Ft. S. & M. R. Co. v. Botkin,* 240 U. S. 227, 36 Sup. Ct. 261, is called to our attention as in conflict with the previous opinion in the present case.    We have been unable to see in what respect the cases conflict. There are no other contentions made which we deem it necessary to comment upon.

Upon the opinion previously rendered as supplemented by the present opinion the demurrer must be sustained.

*By the Court.*—The demurrer to the amended complaint is sustained, and judgment ordered dismissing the action on the merits without costs.