Sᴛᴀᴛᴇ ᴇx ʀᴇʟ. Fʀᴇᴅᴇʀɪᴄᴋ, Petitioner, vs. Zɪᴍᴍᴇʀᴍᴀɴ, Secretary of State, and others, Respondents.

*April 16—April 18, 26, 1949.*

602

The facts will be stated in the opinion which follows.

ROSENBERRY, C. J.    Due to the expiration of the term of the incumbent, under the provisions of the constitution and the statute, an election was to be held on the first Tuesday of April, 1949, for the office of justice of the supreme court. Early in the year it became apparent that there would be an unprecedented number of candidates for that office, as well as for the office of state superintendent of public instruction. (By the provisions of sec. 1, art. X, of the constitution "the state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court.")

Anticipations respecting the number of candidates were fully realized.    Within the time prescribed, twelve candidates filed nomination papers as candidates for the office of justice

of the supreme court and ten candidates filed nomination papers as candidates for the office of state superintendent of public instruction. It was obvious to the legislature that as matters stood the consequence would be an election to an important office by a small minority and that some legislation should be passed to prevent such an undesirable result. The April 5th primary established the correctness of the legislative appraisal. On that day the highest number of votes received by any nominee was twenty per cent of the total. Steps were taken to enact the necessary legislation and on January 21, 1949, a bill to amend the election laws in certain specified instances was introduced in the senate by Senator Knowles, and was reported by the judiciary committee for passage on February 3d, and after the customary parliamentary maneuvering, was passed by the senate on February 16th. It was received in the assembly the following day and on March 4th it was concurred in by the assembly. It was reported enrolled on March 15th, was approved by the governor on that day, and published on March 17th as ch. 15, Laws of 1949.

The material portions of ch. 15, Laws of 1949, are printed in the margin.[1]

Stated briefly, it changed the April 5th election, so far as justices of the supreme court and the state superintendent of public instruction were concerned, from an election to a pri-

---

[1] 8.06 *Primary Elections.* (1) Whenever nomination papers for more than two candidates for the office of justice or superintendent are filed, the April election shall be a primary election for such office.

(2) If at such primary election for justice or superintendent one candidate shall receive more than fifty per cent of the votes cast for all candidates for that office, he shall be deemed duly elected and no further election shall be held.

(3) If no candidate shall receive more than fifty per cent of such votes, a regular election shall be held the first Tuesday of May following, at which time the names of the person receiving the highest number and of the person receiving the second-highest number of legal votes cast for that office at the primary election shall be placed on the ballot, and none other.

(4) (Omitted.)

(5) The person receiving the highest number of legal votes cast at such May election for such office shall be deemed duly elected thereto.

mary if more than two candidates should file for these offices respectively. In the event that no candidate should receive more than fifty per cent of the votes it provided that the regular election should be held on the first Tuesday of May, which is May 3d in the year 1949, and that the person receiving the highest number of legal votes cast at such May election for such office should be deemed duly elected thereto.

It is the contention of the relator that ch. 15, Laws of 1949, is unconstitutional and void under the provisions of sec. 4, art. VII, of the constitution on the following grounds:

First: It provides an election process contrary to that provided by said article and section of the constitution of the state.

Second: It is unconstitutional for the reason that it treats a general election so provided by said constitutional provision as a nomination only and requires a second election subsequent to said general election held on April 5th, pursuant to the provision of said constitution as providing for such election being "as now provided."

Third: It is unconstitutional because it changes the date fixed by said provision of the constitution adopting the statute of the state as then provided for the holding of such election on the first Tuesday of April of each year.

Fourth: It is unconstitutional in that it violates the right of the citizen who has signed the nomination papers for the offices of justice of the supreme court and state superintendent of public instruction filed before the act was passed, published, or became effective.

The relator further contends that ch. 15, Laws of 1949, being void, the holding of an election on May 3, 1949, would impose an unjust burden upon him and all taxpayers similarly situated.

Fifth and sixth reasons assigned are argumentative and the contentions of counsel are fully covered by the four contentions set out.

A decision of the questions raised requires us to consider the history of sec. 4, art. VII, of our state constitution. The

original sec. 4 is to be found in the constitution ratified in the month of March, 1848. The part material in this controversy is as follows:

"The legislature shall have the power, if they should think it expedient and necessary, to provide by law, for the organization of a separate supreme court, with the jurisdiction and powers prescribed in this constitution, to consist of one chief justice and two associate justices, to be elected by the qualified electors of the state, at such time and in such manner as the legislature may provide. . . ."

The words "to be elected by the qualified electors of the state" appear in other sections of the constitution of 1848: Notably in sec. 4, art. IV, Const., relating to the election of members of the legislature; sec. 3, art. V, relating to the election of governor and lieutenant governor; sec. 1, art. VI, relating to the election of the other constitutional officers not referred to above. Circuit judges were also to be elected by the "qualified electors" of the circuit. Sess. Laws of 1848, p. 10.

In 1872 an amendment to the constitution was submitted, amending sec. 4, art. VII, which was rejected by the people at the November, 1872, election. This proposed amendment contained the provision "to be elected by the qualified electors of the state at such times and in such manner as the legislature may provide."

At the November, 1877, election sec. 4, art. VII, Const., was amended to read as follows:

"The supreme court shall consist of one chief justice and four associate justices, to be elected by the qualified electors of the state. The legislature shall, at its first session after the adoption of this amendment, provide by law for the election of two associate justices of said court, to hold their offices respectively for terms ending two and four years respectively, after the end of the term of the justice of the said court then last to expire. And thereafter the chief justice and associate justices of said court shall be elected and hold their offices respectively for the term of ten years."

At the April, 1889, election, sec. 4, art. VII, Const., was amended. The matter was submitted to a vote of the people by ch. 22, Laws of 1889, published on February 28, 1889. The recital is as follows:

"Whereas, The legislature of this state at the biennial session for the year 1887, proposed and adopted by a vote of a majority of the members elected to each of the two houses, an amendment to the constitution of this state, the same being in fact an amendment to section 4, of article 7, thereof, as amended in 1877, the proposed amendment being in the following language: . . .

"Section 1. The chief justice and associate justices of the supreme court shall be severally known as justices of said court with the same terms of office, respectively as now provided. The supreme court shall consist of five justices (any three of whom shall be a quorum), to be elected as now provided. . . ."

It is contended on behalf of the relator that the words "now provided" had the effect of incorporating into the constitution of the state of Wisconsin the legislative enactments then in force relating to the election of the justices of the supreme court, and that it was thereafter beyond the power of the legislature to modify or make different provisions for the election of justices than those then in force.

From 1853 to the time of the amendment of 1877 justices were elected in the manner prescribed by the legislature. The amendment of 1877 continued the power of the legislature to prescribe the method of electing justices by providing that the "legislature shall . . . provide . . . for the election of two associate justices. . . . And thereafter the chief justice and associate justices of said court shall be elected. . . ." This provision meant and could mean nothing else than that the justices should thereafter be elected in a manner to be prescribed by the legislature. When the amendment of 1889 was adopted the words "to be elected as now provided" clearly meant as then provided in the 1877 amendment. Reading the amendments together no other conclusion can be reached

logically. The words "to be elected as now provided" found in the 1889 amendment clearly refer to the provisions of the constitution and not to statutory regulations previously enacted. Subsequent acquiescence of all the officers of government and of the people clearly demonstrates the correctness of this conclusion.

It is apparent that the 1889 legislature so understood it. The amendment was approved at the April 2, 1889, election. On the day after the election the governor approved ch. 248, Laws of 1889, and it was published April 5th.

Sec. 3, ch. 248, Laws of 1889, provided:

"Any convention or primary meeting, as hereinafter defined, held for the purpose of making nominations to public office, may nominate candidates for public office to be filled by election within the state. Individual voters to the number and in the manner hereinafter specified, may also nominate candidates for public office."

This is a material alteration of the law as it previously stood. Sec. 16 of that act provided:

"Except as in this act otherwise provided it shall be the duty of the county clerk of each county to provide printed ballots for every election for public officers in which voters or any of the voters within the county participate. . . . Ballots other than those printed by the respective county clerks according to this act, shall not be cast or counted. . . ."

Prior to the enactment of ch. 248, Laws of 1889, sec. 32, R. S. 1878, provided:

"Each elector shall publicly, at the poll where he offers to vote, deliver in person to one of the inspectors of the election, a single ballot or piece of paper, on which shall be written or printed the names of all persons voted for by such elector, at such election, with a pertinent designation of the respective office which each person so voted for may be intended to fill. . . ."

The last amendment to sec. 4, art. VII, Const., was ratified by a vote of the people at the November, 1903, election. It provided:

"The chief justice and associate justices of the supreme court shall be severally known as the justices of said court, with the same terms of office of ten years respectively as now provided. The supreme court shall consist of seven justices, any four of whom shall be a quorum, to be elected as now provided, not more than one each year. . . ."

If the words "to be elected as now provided," found in the amendment of 1889 are to be construed as counsel contends, then there could be no change or amendment to the law respecting the electing of justices on and after April, 1889, although in the same month in which the amendment was adopted the legislature did modify the law in that respect.

If we were to adopt the construction contended for and there could be no amendment of the law relating to the election of justices after 1889, then the amendment adopted in 1903 would relate back to the election laws in force at the time of the adoption of the amendment in April, 1889. It is apparent that neither the legislature, the governor, nor the election officers so construed it. The 1903 amendment was submitted pursuant to the provisions of ch. 10, Laws of 1903. In ch. 10 the legislature provided:

"In the event that said proposed constitutional amendment shall be adopted and ratified by the people, section 94s of the Wisconsin statutes of 1898, as amended by section 1 of chapter 7 of the laws of 1899, shall be amended by striking out in the seventh line thereof the words 'justice of the supreme court or' and by adding at the end of said section 1 of chapter 7, the following: 'In all cases of vacancy in the office of justice of the supreme court, the person appointed to fill such vacancy shall continue to hold his office until an election can be had in some year in which no other justice is elected pursuant to the constitution and laws of the state, and until his successor has been duly elected and qualified.'"

The provisions of this section could not operate until after the adoption of the amendment, and there seems to have been no doubt in anybody's mind that such enactment was valid, although it changed the method of election prescribed by the statutes previous to the adoption of the amendment. It has

governed the filling of vacancies of justices of the supreme court from that time to this.

Mr. Justice CHARLES V. BARDEEN died March 20, 1903. His term would have expired January 1, 1904. He had previously filed his nomination papers and the time for filing nomination papers expired three days subsequent to his death. Papers were already on file for another nominee, an able and respected lawyer. Two days after the time for filing nomination papers had expired the legislature enacted ch. 27, Laws of 1903, extending the time within which nominations might be made to March 28, 1903. Nomination papers were filed nominating ROBERT G. SIEBECKER for the full term beginning January 1, 1904. At the ensuing election Judge SIEBECKER was elected. The enactment of this law by the legislature, its approval by the governor, and the acquiescence in the result by the electorate without contesting it on the basis of its deviation or departure from the statutes in force and effect prior to the adoption of the 1889 amendment clearly establishes the fact that the alteration of the laws relating to the election of justices by the legislature subsequent to the adoption of the 1889 amendment was so understood by the legislature, the governor, the election officials, the opposing candidate, and the people generally.

Throughout the history of the state these and other enactments making substantial changes in the laws relating to the election of justices have been in full force and effect and have never been questioned. The several legislatures which have legislated with respect to the holding of elections for justices have done so without any regard to the limitation now claimed by the relator to exist by reason of the use of the words "shall be elected as now provided" in the 1889 amendment. A reference to some of these laws not already referred to is printed in the margin.[1]

---

[1] Ch. 379. Laws of 1891; ch. 47, Laws of 1899; ch. 349, Laws of 1899; ch. 459, Laws of 1901; ch. 522, Laws of 1905; ch. 424, Laws of

If the contentions of the relator were to prevail not a single justice of the supreme court would have been elected in accordance with the provisions of the constitution and the statutes since April 2, 1889.

It is considered that an interpretation of the language employed in the several amendments to the constitution of this state affords a sound basis for the conclusion that the words "to be elected as now provided" found in the amendment of 1889 and in the amendment of 1903 were not intended to and did not incorporate in the constitution the statutory provisions relating to the election of justices of the supreme court.

If that were not sufficient, the fact that that construction has been acquiesced in by the people and their representatives for sixty years must, in accordance with the established rules for the construction of constitutional provisions, be given great if not controlling weight.

In the case of *State ex rel. Bashford v. Frear* (1909), 138 Wis. 536, 555, 120 N. W. 216, the court had under consideration the meaning of the phrase "his term of office" as contained in sec. 26, art. IV, of the constitution as applied to a justice of the supreme court. In that case the court said:

"It is the opinion of the court that the view which has so long prevailed, which commenced, so far as discovered, with Chief Justice WHITON, one of the dominating personalities framing the constitution, seconded by Justice COLE, also one of such framers, and has been the guide for many legislatures, justices of this court, and all state officers having to do with the matter, without any disturbance whatever till a question was raised, as we have indicated, [1909] under the peculiar

1905 amended sec. 49, Stats. 1898; ch. 91, Laws of 1905, which provided that no election to fill a vacancy for justice of the supreme court shall be held at the time of holding of the regular election for such office. Sec. 33, Stats., ch. 483, Laws of 1909. The same chapter amended subs. 15 and 16 of sec. 38 of the statutes, which provided that no party designation shall be placed upon the ballots for any school or judicial officer. Ch. 492, Laws of 1913; ch. 461, Laws of 1915; ch. 128, Laws of 1945, providing for electors serving in the armed forces to vote.

wording of the law of 1901, should continue to be the guide; that such construction of sec. 26, art. IV, is permissible, if not plainly required, and that after so long and so harmonious submission to such construction, it should be regarded as the correct one. . . .

"It requires a very clear case to justify changing the construction of a law, conceded to be somewhat involved, which has been uninterruptedly acquiesced in for so long a period as fifty years. It is firmly the opinion of the court, for reasons we have endeavored to state with the fulness the importance of the case demands, that a situation justifying a change does not exist as to the matter in question."

In the case of *Dean v. Borchsenius* (1872), 30 Wis. 236, 246, the court said:

"The uninterrupted practice of a government prevailing through a long series of years, and the acquiescence of all its departments, legislative, executive and judicial, sometimes become imperative even on constitutional questions. If ever there were such a case, this would seem to be one, and the objection of counsel must be overruled."

*Northwestern Mut. L. Ins. Co. v. State* (1916), 163 Wis. 484, 155 N. W. 609, 158 N. W. 328; *Schultz v. Milwaukee County* (1944), 245 Wis. 111, 13 N. W. (2d) 580. See 4 West's Wis. Dig., p. 614, secs. 19 and 20, and cases cited. See 11 Am. Jur., Constitutional Law, p. 701, sec. 80, and cases cited.

We conclude therefore that it is within the power of the legislature to regulate the conduct of judicial elections as it has done since the enactment of ch. 395, Laws of 1852, published March 26, 1852, down to this time, and that ch. 15, Laws of 1949, contravenes no provision of the constitution.

Having reached the conclusion that the amendment to sec. 4, art. VII, of the constitution did not incorporate the statutory law relating to the election of justices in the constitution, the second and third contentions of the relator will be passed.

The relator contends that ch. 15, Laws of 1949, is void because it unconstitutionally deprives a citizen of the right to have the person for whom he has signed a nomination paper voted for at the April, 1949, election, such nomination paper having been filed before ch. 15 was passed, published, or became effective.

The right of a qualified elector to cast a ballot for the election of a public officer, which shall be free and equal, is one of the most important of the rights guaranteed to him by the constitution. If citizens are deprived of that right, which lies at the very basis of our democracy, we will soon cease to be a democracy. For that reason no right is more jealously guarded and protected by the departments of government under our constitutions, federal and state, than is the right of suffrage. It is a right which was enjoyed by the people before the adoption of the constitution and is one of the inherent rights which can be surrendered only by the people and subjected to limitation only by the fundamental law. *State ex rel. McGrael v. Phelps* (1910), 144 Wis. 1, 128 N. W. 1041; *State ex rel. Barber v. Circuit Court* (1922), 178 Wis. 468, 190 N. W. 563.

While the right of the citizen to vote in elections for public officers is inherent, it is a right nevertheless subject to reasonable regulation by the legislature. *State ex rel. McGrael v. Phelps, supra; State ex rel. La Follette v. Kohler* (1930), 200 Wis. 518, 228 N. W. 895, and cases cited.

It is true that the right of a qualified elector to cast his ballot for the person of his choice cannot be destroyed or substantially impaired. However, the legislature has the constitutional power to say how, when, and where his ballot shall be cast for a justice of the supreme court.

Legislation regulating the exercise of the elective franchise is subject to at least five tests:

(a) The express and implied inhibitions of class legislation;

(b) The recognized existence and inviolability of inherent rights;

(c) The constitutionally declared purposes of government;

(d) The express guaranty of the right to vote, and

(e) The regulation must be reasonable.

It cannot be fairly said that there is anything in ch. 15, Laws of 1949, which can be construed as discriminatory or in any way constitutes class legislation, nor does it deprive or limit the right of the citizen to express his choice for the selection of public officers. By enacting ch. 15 the legislature declared the legislation to be in the public interest and necessary to promote the constitutionally declared purposes of government.

Sec. 1, art. I, of the constitution provides:

"All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

Ch. 15, Laws of 1949, does not invade these constitutionally declared purposes of government or any other provision of art. I of the constitution, and is fully in accord with the expressed purposes of government set forth in the preamble to the constitution.

We come now to a consideration of the operation of ch. 15, Laws of 1949. The constitution contains no limitations upon the power of the legislature to regulate elections for justices of the supreme court, except the following:

(1) By the provisions of sec. 4, art. VII, Const., justices are to be elected by the qualified electors of the state not more than one each year.

(2) By the provisions of sec. 9, art. VII, Const., ". . . There shall be no election for a judge or judges at any general election for state or county officers, nor within thirty days either before or after such election."

This provision was in the constitution as originally adopted. Whether it applies to the election of justices of the supreme court is a question that has never been raised so far as we are able to ascertain. At the time of its adoption the constitution provided that the supreme court should be composed of the judges of the five judicial circuits and it applied to them. While the words "justice" and "judge" are defined in ch. 8, Stats., the effect of that provision is limited to the provisions of that chapter. While the constitution provides that members of the assembly and of the senate and the governor shall be elected at the November election there is no similar provision in the constitution relating to justices of the supreme court.

Where a state constitution, as does the constitution of Wisconsin, vests the legislative power of the state in a senate and assembly, the exercise of such power is subject only to the limitations and restraints imposed by the constitution and the constitution and laws of the United States. If it were not for the constitutional provisions already referred to, the legislature would have unrestricted control over the entire subject of elections.

The enactment of ch. 15, Laws of 1949, violated no express provision of the constitution. The question remains whether it deprives the electors of the state of any right guaranteed to them by any other provision of the constitution. Under the provisions of ch. 15 an elector may sign a nomination paper for the person of his choice. If more than two are nominated he then may vote for his choice of all the nominees,—in this case twelve. It certainly did not deprive the electors of the right to vote for a candidate. It clearly preserved the right of the elector to vote for his choice as between the two who receive the highest number of votes at the primary. The enactment therefore increased rather than diminished the right of the elector. The right of choice of candidates by the elector was

fully preserved under the provisions of ch. 15. It is also considered that it was clearly within the power of the legislature in the public interest to provide under the circumstances which existed that what was designated the April 5th election should be deemed to be a primary election and not an election to the office of justice.

This provision can only be assailed on the grounds on which primary-election laws were originally claimed to be unconstitutional. The matter has been so long and so thoroughly settled that it is considered it needs no further elucidation here. *State ex rel. Van Alstine v. Frear* (1910), 142 Wis. 320, 125 N. W. 961. *State ex rel. La Follette v. Kohler, supra.*

In so providing no candidate either at the primary or the election was deprived of any of his constitutional or statutory rights. One method of nomination was substituted for another. For many years the statute contained a provision that candidates for justice of the supreme court might be nominated either by party convention or by filing of so-called nomination papers. The fact that the candidates were to be nominated on the day on which other officers were elected in no way involves or affects the validity of the nomination and election of candidates for justice of the supreme court.

Great stress was laid in the course of the oral argument upon the fact that the day upon which justices were chosen had not been changed. Upon the adoption of the constitution the legislature enacted a law which provided :

"An election for judges of the circuit courts of this state, shall be held in each of the judicial circuits on the first Monday of August in the year one thousand eight hundred and forty-eight." See Sess. Laws of 1848, p. 19.

The judges so elected constituted the first supreme court. This law remained in effect until the enactment of the revised statutes of 1858.

When in the exercise of the authority conferred upon it by sec. 4, art. VII, Const., the legislature created a separate su-

preme court by the enactment of ch. 395, Laws of 1852, it was provided that the election for that office should be held on the last Monday of September. This act remained in force until the enactment of the revised statutes of 1858.

The fact that the legislature has not recently exercised the undoubted power it has to change the date upon which the justices of the supreme court shall be elected in no way affects its power to do so. It is true that since the revision of 1858 elections for justices and judges have been held on the first Tuesday of April, but this is due to a legislative enactment and not to a provision of the constitution.

It is also argued that the nominees whose nomination papers were filed at various times between February 24, 1949, and March 4, 1949, acquired a right under the statute to have their names presented to the electors as candidates for election and that that was a right which could not be destroyed by act of the legislature.

While the right to vote is an inherent or constitutional right, the right to be a candidate is not of that character. It is a political privilege which depends upon the favor of the people and this favor may be coupled with reasonable conditions for the public good.

*Taylor & Marshall v. Beckham* (1900), 178 U. S. 548, 577, 20 Sup. Ct. 890, 1009, 44 L. Ed. 1187, was an election contest which arose in Kentucky and was brought by writ of error to the supreme court of the United States, and dealt extensively with the nature of the right to hold public office. In the course of its opinion the court said:

"Nor does the fact that a constitution may forbid the legislature from abolishing a public office or diminishing the salary thereof during the term of the incumbent change its character or make it property. True, the restrictions limit the power of the legislature to deal with the office, but even such restrictions may be removed by constitutional amendment. In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a

contract right." See also 42 Am. Jur., Public Officers, p. 907, sec. 37, and cases cited; 18 Am. Jur., Elections, p. 276, sec. 147.

It was held in *State v. Douglas* (1870), 26 Wis. 428, that an office created by act of the legislature may be abolished in like manner or the term of the officer otherwise shortened by general legislation after his election, in the absence of any special provision of the constitution forbidding it. See Anno. 4 A. L. R. 205, Power to abolish or discontinue office, and cases cited; see also Anno. 172 A. L. R. 1366.

Originally the voter wrote the name of the person for whom he wished to cast his ballot on a piece of paper, or it might be printed on. Then a law was enacted providing that ballots should be furnished. In regard to justices of the supreme court it was provided that the ballot should be of a certain color and texture of paper. It was also provided that nominations might be made by party convention or by nomination papers signed as provided by statute.

Finally these laws were superseded by the primary-election law and thereafter it was provided that nominations for the office of justice of the supreme court could be made only by nomination paper. All these laws were subject to the rule of law that an elector has the right to cast his ballot for whomsoever he chooses and cannot constitutionally be deprived of it.

While the precise question involved here has not arisen so far as we are able to discover, it is clear that the status of nominee does not rise to the dignity of an office. The so-called right to be a nominee or candidate is a privilege accorded him by legislative enactment. If a candidate wishes his name placed on an official ballot he must conform to the requirements of the law. If he may be deprived of his office after he is elected, the office being one created by the legislature and not one protected by constitutional provision, there is no reason why the legislature may not provide that his nomination for office shall be treated as a nomination at a primary for an

office to be voted for at a succeeding election. Elections are entirely statutory and subject to regulation in the public interest by the legislature.

No contention is made that any provision of ch. 15, Laws of 1949, in any aspect of the case is unreasonable when applied to the facts of this case.

It is considered that ch. 15, Laws of 1949, meets every test prescribed in *State ex rel. McGrael v. Phelps, supra.* It preserves every right of the voter and of the nominee. It merely provides a different method of exercising the political processes which confer upon one candidate the privilege of holding the office of justice of the supreme court or superintendent of public instruction.

The mandate filed April 18th has already been set out.

FAIRCHILD, J., took no part.