SHIRLEY S. ABRAHAMSON, C.J.
¶ 69. {dissenting.)
Who are to be the electors .. . ? Not the rich, more than the poor; not the learned, more than the ignorant; not the haughty heirs of distinguished names, more than the humble sons of obscurity and unpropitious fortune. The electors are to be the great body of the people of the United States.
The Federalist No. 57 (1788) (James Madison).
¶ 70. Today the court follows not James Madison —for whom Wisconsin's capital city is named — but rather Jim Crow — the name typically used to refer to repressive laws used to restrict rights, including the right to vote, of African-Americans.
¶ 71. Indeed the majority opinion in NAACP v. Walker[1] brings the specter of Jim Crow front and *393 center. It invalidates costs incurred by a qualified Wisconsin voter to obtain an Act 23 photo ID as an illegal de facto poll tax.[2]
¶ 72. The right to vote is "a sacred right of the highest character."[3] The Wisconsin Constitution explicitly confers the right to vote upon all qualified individuals as specified in Article III, Section 1 of the Constitution:
Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district.
So fundamental and sacred is the right to vote, the Wisconsin Constitution allows legislative regulation of voting in only a few enunciated areas. Wis. Const, art. Ill, § 2.[4]
*394 ¶ 73. The right to vote is "a fundamental political right, because [it is] preservative of all rights."[5] Accordingly, the right to vote is the most protected of rights:
The right of a qualified elector to cast a ballot for the election of a public officer, which shall be free and equal, is one of the most important of the rights guaranteed to him [or her] by the constitution. If citizens are deprived of that right, which lies at the very basis of our Democracy, we will soon cease to be a Democracy. For that reason, no right is more jealously guarded and protected by the departments of government under our constitutions, federal and state, than is the right of suffrage. It is a right which was enjoyed by the people before the adoption of the constitution and is one of the inherent rights which can be surrendered only by the people and subjected to limitation only by the fundamental law.
State ex rel. Frederick v. Zimmerman, 254 Wis. 600, 613, 37 N.W.2d 473 (1949) (emphasis added).
¶ 74. When an individual who is qualified under the Wisconsin Constitution goes to the polls to vote, no legislative action may prevent that person from casting a ballot:
*395 [A]n act of the legislature which deprives a person of the right to vote, although he has every qualification which the constitution makes necessary, cannot be sustained.
State ex rel. Knowlton v. Williams, 5 Wis. 308, 316 (1856).
¶ 75. Yet under the majority opinion, an individual who has fulfilled every requirement to vote — he or she is a citizen of the United States, is a resident of Wisconsin, is over the age of 18, and is registered — can nonetheless be denied the right to vote for failing to produce a government-issued photo identification enumerated in Act 23,[6] such as a driver's license or receipt therefore, a State identification card or receipt therefore, a military identification card, a United States passport, certain certificates of United States naturalization, an identification by a federally recognized tribe, or certain university and college identification cards.[7]
*396 ¶ 76. These Act 23 photo IDs are not mandated in the Wisconsin Constitution as a qualification to vote.[8]
¶ 77. The State may require verification of the identity of the voter, but Act 23 severely restricts and limits the form of identification that enables a qualified voter to cast a ballot. Rather than merely verify identity, Act 23's requirement conditions the right to vote on possession of a restricted list of identifying documents; no other form of proof of identity than an Act 23 photo ID allows a qualified voter to verify identity and cast a ballot. By restricting verification of identity to only certain government-issued photo IDs, Act 23 does not condition the right to vote on verification of identity. Instead, Act 23 conditions the right to vote on production of a particular identity card. Requiring a specific *397 photo ID is an additional qualification on the right to vote, and is therefore impermissible under the Wisconsin Constitution.
¶ 78. Without any evidence that in-person voter impersonation is a problem in Wisconsin,[9] the voting restrictions that the majority opinion approves today give Wisconsin the most restrictive voting laws in America,[10] laws that systematically disenfranchise entire classes of individuals who are without the required Act 23 photo ID. For example, an estimated 23 percent of persons aged 65 and over do not have a Wisconsin driver's license or other Act 23 photo ID.[11]
¶ 79. Qualified and registered Wisconsin individuals who voted in the last election may be barred from voting in the next election under today's majority opinions in NAACP and the instant case unless they obtain an Act 23 photo ID. Their vote is now contingent upon possession of a specific ID, not their constitutional qualifications to vote or their identity. The possession of an Act 23 photo ID may be further contingent on the discretion of an agency administrator who determines *398 whether an individual can obtain an Act 23 photo ID.[12] "These disenfranchised citizens would certainly include some of our friends, neighbors, and relatives."[13]
¶ 80. I write in dissent to discuss both the instant case and the NAACP case.
¶ 81. First, the two cases address the constitutionality of the same Act 23 but are inconsistent.
¶ 82. According to NAACP, the fees imposed to obtain an Act 23 photo ID constitute an impermissible de facto poll tax.[14] Thus Act 23 creates an unconstitutional precondition on the right to vote, according to NAACP. A charge to comply with Act 23 creates a severe and unconstitutional burden on the right to vote, according to NAACP[15]
¶ 83. In the instant case, the court, addressing the same Act 23, concludes that no precondition to voting has been created. This inconsistency between the two cases is unexplained.
¶ 84. How can the de facto poll tax be unconstitutional in the NAACP case, while the court declares all of Act 23 constitutional in the instant case as not imposing any additional qualifications for voters? Isn't NAACP precedential in the instant case?
¶ 85. Additionally, the NAACP majority opinion is internally inconsistent in failing to invalidate various fees and costs associated with obtaining documentation *399 necessary to obtain an Act 23 photo ID. Fees and costs imposed on a person constitutionally qualified to vote are an integral part of the Act 23 photo ID requirement.
¶ 86. Second, I articulate the key principles from our case law that guide the high and exacting standard of judicial scrutiny required for review of legislation regulating the right to vote.
¶ 87. Neither NAACP nor the instant case applies Wisconsin's voting rights jurisprudence to interpret the Wisconsin Constitution in the present case.
¶ 88. Indeed, the two opinions apply different standards of review to gauge the constitutionality of Act 23 under Article III of the Wisconsin Constitution. How can that be? The same Act 23 is challenged in both cases as unconstitutional under Article III of the state constitution. Both cases present a facial challenge. The plaintiffs in both cases assert that Act 23 imposes a burden on qualified voters. No persuasive reason is given for the different standards of review in the two cases.
¶ 89. Our state's case law outlines key principles that protect the right to vote in the face of legislative election regulations. The "presumption of constitutionality"[16] applied by the majority opinion in the instant case is wholly inappropriate under longstanding state law for the protection of the fundamental, sacred right to vote.
¶ 90. Third, I apply the principles of the Wisconsin voting rights cases to the instant case and conclude that the League of Women Voters and the circuit court are correct: Act 23 unconstitutionally adds a qualification to the right to vote.
*400 ¶ 91. If a qualified voter fails to produce an Act 23 photo ID, Act 23 bars that person from voting even though that voter meets all the qualifications enumerated in the Wisconsin Constitution and meets all the statutory voter registration requirements. Thus Act 23 deprives qualified, registered Wisconsin voters of the right to vote, based solely on their failure to meet a legislatively established precondition to voting. Such deprivation amounts to an impermissible legislative amendment of the Wisconsin Constitution to add a voter qualification.
¶ 92. Today's holding, along with the holding in NAACP, undermines the very foundation of our democracy and deprives individuals of the most sacred of constitutional rights through no fault of their own.[17]
¶ 93. Act 23 is facially unconstitutional and void. This court cannot rewrite Act 23 to make it constitutional. That task is for the legislature.
¶ 94. Accordingly, I dissent.
I
¶ 95. The opinions in the instant case and NAACP are inconsistent. If Act 23 imposes a de facto poll tax in NAACP, does it not impose a de facto poll tax in the instant case? The majority opinion and Justice Crooks' dissent in NAACP recognize that Act 23 in effect creates, in whole or in part, facially unconstitutional restrictions on the right to vote.[18] The holding of NAACP is precedential and governs the instant case.
¶ 96. The NAACP majority opinion follows the lead of the United States Supreme Court in Harper v. Virginia State Board of Elections, 383 U.S. 663 (1966), *401 which finally struck down poll tax laws that were created to burden African-American voters.[19]
¶ 97. In Harper, the Court struck down a $1.50 poll tax on the ground that "payment of any fee" to a Virginia governmental entity could not be required as a precondition of voting. Although the Harper Court discussed the uneven impact such a fee may have on those with limited financial resources, the Court struck down the fee for all voters. The Harper Court declared that payment of a fee to vote is invidious discrimination and has no relation to voter qualifications:
[W]e must remember that the interest of the State, when it comes to voting, is limited to the power to fix qualifications. Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. ... To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor. The degree of the discrimination is irrelevant.... [T]he requirement of fee paying causes an 'invidious' discrimination. . . .
For to repeat, wealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned.[20]
¶ 98. The NAACP majority opinion asserts that "to constitutionally administer Act 23, the [Department of Motor Vehicles] may not require documents in order to issue a [Department of Transportation] photo iden *402 tification card for voting that require payment of a fee to any government agency." NAACP, 2014 WI 98, ¶ 7 n.5.
¶ 99. Despite apparently invalidating some fees and costs for obtaining Act 23 photo IDs, the NAACP majority opinion does not resolve the de facto poll tax issue for other fees and costs.
¶ 100. For example:
• An individual may need to obtain a court order in the case of a name change, gender change, adoption, or divorce, which will require additional filing and court costs.[21]
• An individual may need to provide a marriage certificate or certified copy of a judgment of divorce,[22] which will require court costs, filing fees, and other costs associated with a court order.
• An individual must provide citizenship documentation to obtain Act 23 photo ID,[23] such as a passport, a certificate of United States citizenship, a certificate of naturalization, etc., each of which have associated costs imposed by the federal government. The fee for applying is $165 for a passport for first-time adult applicants,[24] and $600 for a certificate of naturalization.[25]
*403 ¶ 101. Exactly which costs and severe burdens the NAACP majority opinion invalidates is anyone's guess.
¶ 102. The NAACP majority opinion avers that it cures the unconstitutional imposition of these costs and fees through its "saving construction" of Wis. Admin. Code § Trans 102.15(3)(b)-(c).[26]
¶ 103. The NAACP majority opinion reads this Department of Transportation regulation to provide that if a qualified voter asserts that he or she is obtaining a photo ID for the purposes of voting, the administrator shall exercise his or her discretion in deciding whether to issue a DOT photo identification card without the documents referenced in § Trans 102.15(3)(a) "in a constitutionally sufficient manner." NAACP majority op., ¶ 71. The NAACP majority opinion leaves the administrator and the public to guess what a "constitutionally sufficient manner" is.
*404 ¶ 104. The NAACP majority opinion regarding Department of Transportation regulations is not, however, a cure for the constitutional defect.
¶ 105. First, the NAACP majority opinion provides no process for an individual to demonstrate that he or she is "constitutionally 'unable'" to obtain the necessary documentation required by Wis. Admin. Code § Trans 102.15(3)(a).[27] What procedures must be followed by the Department of Transportation administrator and his or her designees when reviewing a petition or request? What is the timeline for petitioning the Department of Transportation or the Department of Motor Vehicles and the timeline for the agencies to process the petition or request? What proof may the administrator require? Can a Department of Transportation administrator and his or her designees apply his or her discretion to deny Act 23 photo ID because he or she does not find the petition credible? How may the administrator's ruling be challenged?
¶ 106. The NAACP majority opinion appears to leave discretion in the hands of the Department of Transportation administrator and his or her designees but provides no guidance to the Department of Transportation or to the public about proper procedures and the rights of qualified voters.
¶ 107. Second, the section of administrative regulations that the NAACP majority opinion "construes" to cure Act 23's constitutional defects appears to apply only to documents regarding proof of name and date of birth, not to other documentation required to obtain an Act 23 photo ID. A naturalization certificate required to prove citizenship or a marriage certificate required to prove identity may require payments to a government *405 agency; these documents are not covered by the NAACP majority opinion's "saving" regulation.
¶ 108. Third, as Justice Crooks' dissent notes, fees and costs other than fees paid directly to government agencies may be required to obtain an Act 23 photo ID.[28] These costs are similarly unaddressed and unresolved and may be invidious discrimination.
¶ 109. Thus, although the NAACP majority opinion appears to deem invalid any fees and costs paid to any government agency necessary for documentation to obtain an Act 23 photo ID, its supposed "saving construction" of the administrative regulations fails to cure the myriad variety of costs that Act 23 imposes on individuals attempting to obtain the photo ID necessary to exercise the right to vote.
¶ 110. The NAACP majority opinion invalidates the unconstitutional imposition of some de facto poll taxes as part of Act 23, but leaves other de facto poll taxes, fees, and costs intact.
¶ 111. Yet the majority opinion in the present case declares that Act 23 is facially constitutional. Neither the majority opinion nor I can explain the inconsistency.
II
¶ 112. The majority opinion erroneously uses the "presumption of constitutionality" standard of review to support its conclusions that Act 23 is constitutional. Majority op., ¶¶ 16-17. This standard is particularly inappropriate in the instant case, because:
*406 A. The majority opinion in NAACP has already declared a fee imposed by Act 23 an unconstitutional prerequisite for a qualified voter to exercise the right to vote;
B. The majority opinion in NAACP apparently uses several different standards of review; and
C. The presumption of constitutionality standard does not comport with longstanding state case law in which legislative regulation of voting rights has been challenged.
A
¶ 113. The court has already declared in NAACP that, as a matter of law, the fees imposed by Act 23 for a Department of Transportation photo identification card are in effect a de facto poll tax. The NAACP court has declared that the fees are severe, are so burdensome that they effectively deny qualified persons their right to vote, and are constitutionally impermissible.
¶ 114. The NAACP case is precedential in the instant case. When the court itself has in effect invalidated an integral part of Act 23 as unconstitutional, how can a presumption of constitutionality apply in the instant case? How can the court declare Act 23 constitutional in the instant case?
B
¶ 115. How can two opinions, League of Women Voters and NAACP, mandated the same day, use a different standard of review in gauging the constitutionality of Act 23? The same Act 23 is challenged in both cases as unconstitutional under Article III of the state Constitution. A facial challenge is made in both *407 cases.[29] Indeed, the plaintiffs in NAACP expressly disclaim that that they are making an as-applied challenge.[30] The majority opinion in NAACP concedes that the challenge is a facial challenge.[31]
¶ 116. In the instant case, the majority opinion employs the "presumption of constitutionality" standard, mucking it up somewhat. See ¶ 61, infra.
¶ 117. In NAACP, it is unclear what standard of review, if any, the majority opinion employs to reach its result. Depending on the section, the majority opinion in NAACP asserts several different standards of review.
¶ 118. In the section labeled "Standard of Review," the NAACP majority opinion asserts that "[i]f we conclude that a voter regulation creates a severe burden on electors' right to vote, we will apply strict scrutiny to the statute, and conclude that it is constitutional only if it is narrowly drawn to satisfy a compelling state interest." NAACP, 2014 WI 98, ¶ 22. This appears to be some variation on the Anderson/Burdick federal test for Equal Protection Clause and First Amendment facial challenges to statutes that impair the right to vote. See NAACP, 2014 WI 98, ¶¶ 26-39.
¶ 119. In a strict-scrutiny analysis, the State has the burden to show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." State v. Baron, 2009 WI 58, ¶ 45, 318 Wis. 2d 60, 769 N.W.2d 34.
¶ 120. Yet in the section titled "Foundational Principles," the NAACP majority opinion asserts the presumption of constitutionality is the proper standard, *408 stating that "statutes are presumed to be constitutional." NAACP, 2014 WI 98, ¶ 24. The NAACP majority opinion further asserts that it is the plaintiffs challenging the statute who "must prove that the statute is unconstitutional beyond a reasonable doubt." Id., ¶ 25.
¶ 121. The majority opinion also asserts that the presumption of constitutionality "may vary depending on the nature of the constitutional claim at issue." NAACP, 2014 WI 98, ¶ 24 (citing League of Women Voters). An identical statement appears in the majority opinion in the instant case, citing NAACP Majority op., ¶ 16. This statement is an unexplained cipher, with no meaning or guidance for the analysis in either case or in future cases.
¶ 122. In its section titled "Saving construction," the NAACP majority opinion applies yet another standard of review, asserting that Act 23 is not unconstitutional, averring that "we do not initially weigh the burden identified . . . because a saving construction of the administrative rule must be considered first."[32] Yet a court typically applies a "saving construction" by first assessing whether the statute is unconstitutional and only then assessing whether a saving construction can be applied.[33]
*409 ¶ 123. The NAACP majority opinion usurps the legislative role: "[Although this Court will often
strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of. . . judicially rewriting it. Otherwise there would he no such thing as an unconstitutional statute." State v. Zarnke, 224 Wis. 2d 116, 139-40, 589 N.W.2d 370 (1999) (quoting United States v. X-Citement Video, 513 U.S. 64, 86 (1994) (Scalia, J., dissenting)) (internal quotation marks and citations omitted).
¶ 124. Finally, after its various machinations on the standard of review, the NAACP majority opinion claims to apply rational-basis review. NAACP, 2014 WI 98, ¶ 71.
¶ 125. Only by applying multiple contradicting standards of review can the NAACP majority opinion reach its multiple and contradictory holdings: in one breath invalidating fees required for documentation to obtain an Act 23 photo ID as an unconstitutional de facto poll tax and severe burden, and in the next breath asserting that Act 23 is nonetheless constitutional and that "the burdens of time, inconvenience and cost upon electors' right to vote are not severe under our interpretation of § Trans 102.15 . . . ."[34]
¶ 126. The NAACP majority opinion's shifting standards of review throughout the opinion make it impossible to evaluate how or why the court reaches its decision.
*410 ¶ 127. The majority opinions in NAACP and in the instant case fail to rely on Wisconsin cases that have over the years interpreted and applied the voting provisions of the Wisconsin Constitution.[35]
¶ 128. The majority opinions ignore the uniqueness of Wisconsin's constitutional provision on voting rights and Wisconsin's unique jurisprudence protecting the right to vote under its own constitution. The United States Constitution does not protect voting rights in the same way as does the Wisconsin Constitution,[36] and the federal challenges to state voter ID legislation are based on the Equal Protection Clause.
¶ 129. The majority opinion in the present case attempts to distinguish the League of Women Voters and NAACP cases to justify its different approaches to the standard of review. See majority op., ¶ 11 n.8.
¶ 130. The majority opinion claims that the two cases are different because the League of Women Voters does not assert that Act 23 is so burdensome that it effectively denies the right to vote. Majority op., ¶ 11, n.8. The majority opinion ventures that, in contrast, in NAACP the burdens on the right to vote are at issue. Majority op., ¶ 44 n.ll.[37]
*411 ¶ 131. This distinction is not borne out in the cases. Burdens on the right to vote of constitutionally qualified voters are at issue in both cases.
¶ 132. The League of Women Voters complains that Act 23 adopts and adds qualifications for voting that are not in the Wisconsin Constitution, namely requiring production of a specified photo ID, and thus on its face Act 23 impairs or destroys the voting right of persons constitutionally qualified to vote and creates an impermissible burden on the right to vote.[38] Act 23 destroys or burdens the right to vote by excluding from voting any registered, qualified voter who fails to display the mandated form of photo ID.
¶ 133. In contrast, the NAACP asserts that Act 23 imposes burdens of time, inconvenience, and costs on the constitutionally qualified voter to obtain an Act 23 photo ID.[39]
¶ 134. In both the instant case and NAACP, the challenges are plainly facial challenges asserting a *412 burden on Wisconsin citizens who are qualified to vote under the Wisconsin Constitution.[40] The precise nature of the burden complained of in each case is different, but in both cases the plaintiffs urge that Act 23 imposes a burden on qualified voters impairing or depriving them of their Wisconsin constitutionally guaranteed right to vote.
¶ 135. If a more stringent standard of review than the "presumption of constitutionality" applies in NAACP, it must, in my opinion, also apply in the instant case.
¶ 136. Neither the majority opinion in the instant case, nor the concurrence in the instant case, nor the majority opinion in NAACP advances satisfactory reasons for applying different standards in the two cases. I *413 conclude that this court must apply an identical standard of review in both cases and that the standard of review is not the "presumption of constitutionality" standard.
C
¶ 137. Finally, I conclude that the "presumption of constitutionality" standard of review does not apply because our case law in voting rights cases contravenes this standard. No Wisconsin court has ever applied this presumption to legislative regulations on voting. None of the cases cited by the majority opinion supporting this standard of review relates to the fundamental right to vote, except for NAACP, whose standard of review is, to be charitable, confusing.[41]
¶ 138. Our cases addressing voting rights often do not state a standard of review as such (as was judicial practice at the time the cases were decided), and they predate the federal adoption of strict scrutiny as a judicial standard for reviewing constitutional claims under the federal Constitution.[42]
¶ 139. Nevertheless, key principles can be drawn from our jurisprudence to guide our review of laws governing the right to vote. The essence of the cases is *414 that courts must apply the highest levels of scrutiny to laws regulating the right to vote.[43]
¶ 140. Because of the fundamental nature of the right to vote, the court has recognized that the right to vote is unlike other rights guaranteed by the Wisconsin Constitution and is specially protected from legislative interference:
Thus is given the right to vote a dignity not less than any other of many fundamental rights. So it has been rightly said by judicial writers: "It is a right which the law protects and enforces as jealously as it does property in chattels or lands. ... The law maintains and vindicates" it "as vigorously as it does any right of any kind which men may have or enjoy." State v. Staten, 46 Tenn. 233, 241 [(1869)]. It is commonly referred to as a sacred right of the highest character and then again, at times, as a mere privilege, a something of such inferior nature that it may be made "the foot-ball of party politics." We subscribe to the former view, placing the *415 right of suffrage upon the high plane of removal from the field of mere legislative material impairment.
State ex rel. McGrael v. Phelps, 144 Wis. 1, 15, 128 N.W. 1041, 1046 (1910) (emphasis added).
¶ 141. One key principle in the case law is that the legislature cannot impose a restriction on voting that constitutes an additional "qualification" on the right to vote. Only the Wisconsin Constitution can impose additional qualifications on the right to vote.
¶ 142. The case law has drawn a line between those laws that create an "additional qualification" on the right to vote, thereby impairing an otherwise qualified voter from casting a vote, and those that merely verify a voter's existing constitutional qualifications without restricting his or her existing rights.
¶ 143. This distinction between impermissibly adding qualifications and verifying existing qualifications appears, for example, in two early cases, also cited by the majority opinion,[44] State ex rel. Knowlton v. Williams, 5 Wis. 308 (1856), and State ex rel. Cothren v. Lean, 9 Wis. 254 [*279] (1859).
¶ 144. In Knowlton, an elector challenged a 30-day residency requirement that restricted the right to vote to those individuals who had resided in the district for 30 days prior to election. The court in Knowlton voided the residency requirement as an additional qualification on the right to vote beyond what the constitution required:
We have no doubt that the qualifications of the voters as fixed by the act are, in respect to residence in the state, quite different from those prescribed in the constitution. The latter instrument is explicit; it pro *416 vides in express terms that a person who possesses the other qualifications mentioned, and who has resided in the state one year next preceding any election, shall be deemed a qualified elector at such election.
The constitution provides, that if a person possesses certain qualifications, and has resided in the state one year next preceding any election, he shall be deemed a qualified elector at such election; while the act of the legislature in question provides, in effect, that this shall not be sufficient, but that he shall, in addition, have resided for thirty days previous to the time when the election is holden in the town where he offers his vote.
We have no doubt that the legislature have the power to provide that a person who has a right to vote under the constitution shall be allowed to exercise this right only in the town where he resides, because this would be only to prescribe the place where a right which he possessed under the constitution shall be exercised, and fixes upon the most convenient place for its exercise. Such a provision does not add to the qualifications which the constitution requires; but an act of the legislature which deprives a person of the right to vote, although he has every qualification which the constitution makes necessary, cannot be sustained,[45]
¶ 145. Thus, the law fixing the location where an elector can vote regulated merely how, where, and when to vote, but by adding that the elector had to reside in the district for the previous 30 days, the law in question restricted the rights of those voters who would otherwise be qualified under the Wisconsin Constitution to vote.
¶ 146. The prohibited law in Knowlton must be compared with the law upheld in Cothren. In Cothren, *417 an elector challenged a law that allowed elections officials to "challenge for cause" a voter's qualifications. An election official could challenge the voter's qualifications for cause at the polls; if the voter refused to answer the election official's questions, the vote would not be counted.[46]
¶ 147. The court in Cothren approved of the "challenge for cause" requirement as mere proof that the qualified voter indeed possessed the constitutional qualifications to vote, distinguishing Knowlton because the challenge-for-cause procedure in Cothren did not prescribe additional qualifications. The Cothren court reasoned that the law tested whether the constitutional qualifications for electors were met, rather than creating new requirements. The voter in Cothren "failed to furnish the proof required by law, showing his right to vote," that is, he failed to prove that he had met the existing constitutional qualifications:
[T]he grounds of challenge to which the sets of questions are adapted, imply only the qualifications required by the constitution; nothing further or different. This act, therefore, instead of prescribing any qualifications for electors different from those provided for in the constitution, contains only new provisions to enable the inspectors to ascertain whether the person offering to vote possessed the qualifications required by that instrument, and certainly it is competent for the legislature to enact such. The necessity of preserving the purity of the ballot box, is too obvious for comment, and the danger of its invasion too familiar to need suggestion. While, therefore, it is incompetent for the legislature to add any new qualifications for an elector, it is clearly within its province to require any person offering to vote, to furnish such proof as it deems requisite, that he is a qualified elector.
*418 Cothren, 9 Wis. at 258-59 (1859) (emphasis added).
¶ 148. In sum, the Cothren law targeted only the qualifications required by the constitution. The questions the voters were asked were those questions necessary to ascertain whether the voter satisfied the qualifications enumerated in the Wisconsin Constitution: "the grounds of challenge to which the sets of questions are adapted, imply only the qualifications required by the constitution; nothing further or different." Cothren, 9 Wis. at 258.
¶ 149. The guiding distinction between an impermissible additional qualification and proof of qualification as elucidated by Knowlton and Cothren continued in later cases.
¶ 150. In State ex rel. Wood v. Baker, 38 Wis. 71 (1875), the court further clarified the reasoning of Knowlton and Cothren regarding boundaries on regulating the right to vote. In Baker, the law required a voter's name be verified against an election registry before the voter would be allowed to vote. The registry erroneously omitted a voter.
¶ 151. The Baker court upheld the registry law, but it put a finer point on the distinction between prohibited "additional legislative qualifications" and permissible legislative requirements of "proof of the right" by asserting that the requirement of proof could be only "proof consistent with the right itself," i.e., the proof could verify only the constitutional qualifications of electors. The Baker court, 38 Wis. at 86, declared that the legislature may require reasonable proof of the right to vote but cannot impose "a condition precedent to the right" to vote. Being on the registry was not a precondition to vote because the law "left other proof open to the voter at the election consistent with his present right to vote." The Baker court explained:
*419 And such we understand to be the theory of the registry law ... not to abridge or impair the right, but to require reasonable proof of the right. It was undoubtedly competent for the legislature to provide for a previous registry of voters, as one mode of proof of the right; so that it should not he a condition precedent to the right itself at the election, but, failing the proof of registry, left other proof open to the voter at the election, consistent with his present right (emphasis added).
¶ 152. A second key principle emerges from the case law: "No constitutional qualification of an elector can in the least be abridged, added to, or altered, by legislation or the preten[s]e of legislation. Any such action would be necessarily absolutely void and of no effect."[47] If a law requires of a voter what is impracticable or impossible, and makes the voter's right to vote depend upon a condition he or she is unable to perform, the law impermissibly abridges the constitutional right to vote and is void:
No registry law can be sustained which prescribes qualifications of an elector additional to those named in the constitution, and a registry law can be sustained only, if at all, as providing a reasonable mode or method by which the constitutional qualifications of an elector may be ascertained and determined, or as regulating reasonably the exercise of the constitutional right to vote at an election. If the mode or method, or regulations, prescribed by law for such purpose, and to such end, deprive a fully qualified elector of his right to vote at an election, without his fault and against his will, and require of him what is impracticable or impossible, and make his right to vote depend upon a condition which he is unable to perform, they are as destructive of his constitutional right, and make the law itself as void, as if it directly and arbitrarily disfranchised him with *420 out any pretended cause or reason, or required of an elector qualifications additional to those named in the constitution.
Dells v. Kennedy, 49 Wis. 555, 558, 6 N.W. 246 (1880) (second emphasis added).
¶ 153. As the Baker court emphasized, "[E]very one having the constitutional qualifications then, may go to the polls, vested with the franchise, of which no statutory condition precedent can deprive him."[48] If voters "went to the election clothed with a constitutional right of which no statute could strip them, without some voluntarily failure on their own part to furnish statutory proof of right," regulations that modified the qualifications to deprive these qualified voters of the right to vote in those circumstances would "be monstrous."[49]
¶ 154. A third key principle in the case law distinguishes between cases involving laws that impair or destroy the right to vote, which require the most stringent judicial review, and laws that enhance or expand the right to vote, which receive deference to the legislature as long as the regulation is reasonable.
¶ 155. If a legislative regulation enhances, protects, or expands the right to vote, the inquiry into the regulation need address only whether the regulation was "reasonable," and our review gives deference to "legislative discretion."[50] If, however, a legislative regu *421 lation restricts or impairs the right to vote, then the regulation is void on its face, regardless of state interest.
¶ 156. This principle was stated in Dells v. Kennedy, 49 Wis. 555, 6 N.W. 246 (1880). The Dells court noted that the legislature could enact reasonable and necessary regulations to protect the right to vote, but that the legislature's regulations were afforded no deference if they impaired the right to vote:
For the orderly exercise of the right [to vote] ... it is admitted that the legislature must prescribe necessary regulations as to the places, mode and manner, and whatever else may be required to insure its full and free exercise. But this duty and right inherently imply that such regulations are to be subordinate to the enjoyment of the right, the exercise of which is regulated. The right must not be impaired by the regulation. It must be regulation purely, not destruction. If this were not an immutable principle, elements essential to the right itself might be invaded, frittered away, or entirely exscinded, under the name or preten[s]e of regulation, and thus would the natural order of things be subverted by making the principle subordinate to the accessory. To state is to prove this position. As a corollary of this, no constitutional qualification of an elector can in the least be abridged, added to, or altered, by legislation or the preten[s]e of legislation. Any such action would be necessarily absolutely void and of no effect.
Dells, 49 Wis. at 557.
¶ 157. This principle was further elucidated in State ex rel. McGrael v. Phelps, 144 Wis. 1, 128 N.W. 1041 (1910). The Phelps court recognized that the legislature is afforded a certain amount of deference by the judiciary when the legislature uses the police power to enact reasonable regulations upon voting. If, how *422 ever, the regulation impairs the exercise of the right to vote rather than improves it, the regulation is no longer subject to deference and is instead unconstitutional:
Regulation which impairs or destroys rather than preserves and promotes, is within condemnation of constitutional guarantees. So it follows that, if the law in question trespasses upon the forbidden field, it is only law in form.
State v. Phelps, 144 Wis. 1, 18 (1910).
¶ 158. A final principle from our case law recognizes that because, as a practical matter, government must regulate elections so that they are orderly, fair, and honest, and that such regulations will invariably impose some burdens upon individual voters, the legislature has the power to say how, when, and where a qualified elector may vote, but may not regulate who may vote. The who is governed by the Wisconsin Constitution.
¶ 159. In State ex rel. Frederick v. Zimmerman, 254 Wis. 600, 37 N.W.2d 472 (1949), the court explained the legislature's power as follows:
It is true that the right of a qualified elector to cast his ballot for the person of his choice cannot be destroyed or substantially impaired. However, the legislature has the constitutional power to say how, when and where his ballot shall be cast for a justice of the supreme court.
Frederick, 254 Wis. at 613-14 (emphasis added).
¶ 160. The legislature cannot, however, under the guise of regulating how, when, and where a ballot may be cast, destroy or substantially impair the right to *423 vote.[51] No matter how reasonable the law and how much deference the legislature receives, "[a]ll these laws were subject to the rule of law that an elector has the right to cast his [or her] ballot for whomsoever he [or she] chooses and cannot constitutionally be deprived of it."[52]
¶ 161. The essence of the voting rights jurisprudence interpreting and applying the Wisconsin Constitution is that courts must apply the highest level of scrutiny to laws regulating the right to vote.
Ill
¶ 162. Applying the highest level of scrutiny and applying the key principles derived from our voting rights case law, I conclude that Act 23 is unconstitutional.
¶ 163. The force of the Wisconsin Constitution is clear: "[E]very one having the constitutional qualifications [at the time of election] may go to the polls, vested with the franchise, of which no statutory condition precedent can deprive him [or her][, b]ecause the constitution makes him [or her], by force of his [or her] present qualifications, 'a qualified voter at such election.' " Baker, 38 Wis. at 86.
¶ 164. Under Act 23, a voter qualified under the Wisconsin Constitution — that is, a person who is over the age of 18, is a United States citizen, and is a resident of Wisconsin — and who has met the registration requirements under the Wisconsin statutes cannot vote even if he or she comes to the polls with extensive personal photo identification information. Only an Act *424 23 photo ID suffices. This requirement strips a qualified registered voter of the right to vote.
¶ 165. The legislature does not have the power under the guise of an election regulation to strip a qualified, registered voter of the right to vote.[53] Act 23 deprives a person of the right to vote even though that person meets the constitutional qualifications to vote and is therefore unconstitutional.
¶ 166. I agree with the League of Women Voters and the circuit court that Act 23 impermissibly adds a fourth qualification for voting in addition to the three specified in the Wisconsin Constitution. The fourth qualification is a legislatively specified photo ID. Act 23 deprives all qualified, registered voters who do not possess an Act 23 photo ID from exercising the right to vote. The legislature has thus rendered an Act 23 photo ID in and of itself a qualification for voting.[54]
¶ 167. The State may seek verification of a voter's identity, but the verification must be limited to "proof consistent with the right itself."[55] Act 23 does not merely verify a voter's identity. Rather, Act 23 creates a precondition to vote. In order to cast a ballot, a voter must obtain a specified government photo ID.
*425 ¶ 168. To obtain an Act 23 photo ID, the voter must verify his or her identity with additional documentation.[56] These documents sufficiently provide proof of identity to receive an Act 23 photo ID.
*426 ¶ 169. Yet these documents, all of which verify one's identity for the purposes of obtaining an Act 23 photo ID, are not acceptable under Act 23 to prove identity for the purposes of voting. By restricting verification of identity to specified government-issued photo IDs, Act 23 does not condition the right to vote on verification of identity. Instead, Act 23 conditions the right to vote on production of a particular identity card. Requiring a specific identity card is an additional qualification on the right to vote, and it is therefore impermissible under the Wisconsin Constitution.
¶ 170. The mandatory precondition to voting of presenting an Act 23 photo ID is imposed on all voters who have already established their qualifications to vote through the registration process. No connection exists between the Act 23 voter ID requirement and a voter's constitutional qualifications to vote.
¶ 171. Unlike constitutionally permissible verifications of voter identity, which enable a fully qualified voter to vote by providing various forms of proof of identity, Act 23 has no such fail-safe provision.[57] The only way a voter can exercise the right to vote under Act 23 is to display the requisite ID.
*427 ¶ 172. If the qualified voter cannot obtain, loses, or forgets to bring an Act 23 voter ID, Act 23 strips a qualified voter of the right to vote, even though the ID required by Act 23 is mentioned nowhere in the Constitution. "[A]n act of the legislature which deprives a person of the right to vote, although he has every qualification which the constitution makes necessary, cannot be sustained."[58]
¶ 173. Act 23 in effect amends the Wisconsin Constitution to add a fourth voter qualification, an Act 23 photo ID card, without complying with the constitutional provisions governing amendment of the Wisconsin Constitution [59] This the legislature cannot do.
¶ 174. Furthermore, Act 23 violates key principles established in Wisconsin case law for review of a law regulating voting.
¶ 175. Act 23 does not preserve, promote or enhance a qualified voter's right to vote; it impairs or destroys a qualified voter's constitutional right to vote by requiring a specific form of voter photo identification.[60] It imposes significant burdens of direct and indirect costs on a constitutionally qualified voter to acquire the photo ID, as Justice Crooks explains in his dissent in NAACFJ thus severely and significantly impairing the right of a qualified voter to cast a ballot.[61] "The right must not be impaired by the regulation. It must be regulation purely, not destruction."[62]
*428 ¶ 176. Act 23 abridges, adds to, or alters the constitutional qualifications of electors. As a result of Act 23, qualified voters are barred from voting through no fault of their own.[63] It is clear on the face of Act 23 that some voters will be asked to perform "impracticable or impossible conditions."[64] "[L]egislation on the subject of elections is within the constitutional power of the Legislature so long as it merely regulates the exercise of the elective franchise, and does not deny the franchise itself either directly or by rendering its exercise so difficult and inconvenient as to amount to a denial."[65]
¶ 177. Act 23 does not regulate how, when, and where a voter casts his or vote.[66] By creating the strict requirement that voters without an Act 23 photo ID "shall not be permitted to vote," the legislature has restricted the franchise to a limited group of individuals —those individuals who can present an Act 23 photo ID. Thus Act 23 regulates who is qualified to vote, adding a fourth qualification for voters to meet.
¶ 178. For these reasons, I conclude that Act 23 is unconstitutional on its face.
* * * *
¶ 179. Our State has long recognized that the right to vote is the highest of rights and has enshrined the right in our own constitution. It is the right upon *429 which all other rights depend in a democratic society, and our court has consistently defended and protected that right above all others.
¶ 180. As a result of Act 23, a qualified registered voter, with all the proof of his or her qualifications and identity, can no longer be assured of the right to vote. Act 23 adds a new qualification for voters, repugnant to our constitution and "monstrous" to those qualified voters denied the right to vote through no fault of their own.[67]
¶ 181. For many, including our friends, neighbors, and relatives, Act 23 imposes a precondition to voting that deprives qualified voters of the right to vote. Such a precondition is unconstitutional. "[E]very one having the constitutional qualifications then, may go to the polls, vested with the franchise, of which no statutory condition precedent can deprive him."[68]
¶ 182. For the foregoing reasons, I dissent.
¶ 183. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

 NAACP v. Walker, 2014 WI 98, _ Wis. 2d _, 851 N.W.2d 262, mandated of even date.

 State and federal courts in the Jim Crow era rejected challenges to literacy tests, Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45 (1959), and poll taxes, Breedlove v. Sutiles, 302 U.S. 277 (1937), and onerous registration requirements that functionally deprived millions of the right to vote. Asserting that the legislature had broad powers to determine the conditions under which the right of suffrage may be exercised, the courts turned a blind eye to the effects of these tests on the electorate, especially African-Americans.

 State v. Phelps, 144 Wis. 1, 15, 128 N.W. 1041 (1910).

 Article III, Section 2 of the Wisconsin Constitution provides:
Laws may be enacted:
(1) Defining residency.
(2) Providing for registration of electors.
(3) Providing for absentee voting.
(4) Excluding from the right of suffrage persons:
(a) Convicted of a felony, unless restored to civil rights.
*394 (b) Adjudged by a court to be incompetent or partially incompetent, unless the judgment specifies that the person is capable of understanding the objective of the elective process or the judgment is set aside.
(5) Subject to ratification by the people at a general election, extending the right of suffrage to additional classes.

 Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). See also Reynolds v. Sims, 377 U.S. 533, 562 (1964) (right to vote is "a fundamental political right... preservative of all rights.") (quoting Yick Wo, 118 U.S. at 370).

 I refer to these enumerated photo identifications as "Act 23 photo ID."

 Section 1 of 2011 Wis. Act 23 reads as follows:
5.02(6m) of the statutes is created to read:
5.02(6m) "Identification" means any of the following documents issued to an individual:
(a) One of the following documents that is unexpired or if expired has expired after the date of the most recent general election:
1. An operator's license issued under ch. 343.
2. An identification card issued under s. 343.50.
3. An identification card issued by a U.S. uniformed service.
4. A U.S. passport.
*396 (b) A certificate of U.S. naturalization that was issued not earlier than 2 years before the date of an election at which it is presented.
(c) An unexpired driving receipt under s. 343.11.
(d) An unexpired identification card receipt issued under s. 343.50. FC33(e) An identification card issued by a federally recognized Indian tribe in this state.
(f) An unexpired identification card issued by a university or college in this state that is accredited, as defined in s. 39.30(l)(d), that contains the date of issuance and signature of the individual to whom it is issued and that contains an expiration date indicating that the card expires no later than 2 years after the date of issuance if the individual establishes that he or she is enrolled as a student at the university or college on the date that the card is presented.

 Not every government-issued photo ID satisfies Act 23. Act 23 does not allow an individual to use a Veteran's ID card, the photo ID that the United States Department of Veterans Affairs issues when veterans leave the military, or an ID from one of Wisconsin's two-year technical colleges.

 NAACP, 2014 WT 98, ¶¶ 134-136 (Crooks, J„ dissenting).

 For a helpful list of voter registration and identification requirements from across the country, see National Conference of State Legislatures, Voter Identification Requirements, tbl. 2, http://www.ncsl.org/research/elections-and-campaigns/ voter-id.aspx (last visited July 14, 2014).
No other state requires the production of one of a list of permissible government-issued photo identifications as in Act 23, and no other state forbids other methods of voter identity verification such as affidavit, as does Act 23.

 In contrast, 99% of Indiana's voting age population possessed photo IDs that complied with the new Indiana law. Crawford v. Marion County Elections Bd., 553 U.S. 181,188 n.6 (2008).

 See NAACP, 2014 WI 98, ¶ 67.

 Circuit court op. at 9.
We would ignore reality were we not to recognize that the requirements of Act 23 fall with unequal weight on voters according to economic status. See Bullock v. Carter, 405 U.S. 134, 144 (1972); see also NAACP, 2014 WI 98, ¶¶ 123-129 (Crooks, J., dissenting).

 See NAACP, 2014 WI 98, ¶ 83 n.9 (Crooks, J., dissenting).

 NAACP, 2014 WI 98, ¶¶ 61-65.

 Majority op., ¶¶ 16-17; concurrence, ¶¶ 62-63.

 Dells v. Kennedy, 49 Wis. 555, 557, 6 N.W. 246 (1880).

 NAACP, 2014 WI98, ¶¶ 60-65; id., ¶¶ 86-97 (Crooks, J., dissenting).

 The court overruled Breedlove, 302 U.S. 277, which had upheld poll taxes as constitutional just 30 years prior. By the time Harper was mandated, only four states still imposed poll taxes: Texas, Alabama, Virginia, and Mississippi.

 Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 668, 670 (1966) (internal quotation marks omitted).

 Wis. Admin. Code § Trans 102.15(3)(a)17 (Feb. 2013).

 Wis. Admin. Code § Trans 102.15(4)(a)ll. (Feb. 2013).

 Wis. Admin. Code § Trans 102.15(3m) (Feb. 2013).

 See United States Passports & International Travel, United States Department of State, Passport Fees, http://travel.state.gov/content/passports/english/passports/ information/costs.html (last visited July 14, 2014).

 See Instructions for Form N-600, Application for Certificate of Citizenship, OMB No. 1615-0057 at 7 (2014), available at http://www.uscis.gov/sites/default/files/files/form/n-600instr.pdf (last visited July 14, 2014).

 Wisconsin Admin. Code § Trans 102.15(3)(b)-(c) (Feb. 2013) states as follows:
(b) If a person is unable to provide documentation under par. (a), and the documents are unavailable to the person, the person may make a written petition to the administrator of the division of motor vehicles for an exception to the requirements of par. (a). The application shall include supporting documentation required by sub. (4) and:
1. A certification of the person's name, date of birth and current residence street address on the department's form;
2. An explanation of the circumstances by which the person is unable to provide any of the documents described in par. (a); and
3. Whatever documentation is available which states the person's name and date of birth.
(c) The administrator may delegate to the administrator's subordinates the authority to accept or reject such extraordinary proof of name and date of birth.

 NAACP, 2014 WI 98, ¶ 69.

 NAACP, 2014 WI 98, ¶¶ 102-103, 117-132 (Crooks, J., dissenting).

 See NAACP, 2014 WI 98, ¶¶ 19, 21; majority op., ¶ 14; Justice Crooks' concurrence, ¶¶ 61-63.

 Brief of the Plaintiffs-Respondents at 30.

 NAACP, 2014 WI 98, ¶¶ 19, 21.

 NAACP, 2014 WI 98, ¶ 65.

 See State v. Zarnke, 224 Wis. 2d 116, 124-25, 139-40, 589 N.W.2d 370 (1999) (determining whether to apply a saving construction after State conceded that statute would be invalid otherwise); State v. Hall, 207 Wis. 2d 54, 67, 557 N.W.2d 778 (1997) (presenting three issues, and first determining that statute is unconstitutional, followed by saving construction analysis).
The NAACP majority opinion cites a variety of cases that deal with the jurisprudential doctrine of interpreting statutes to *409 avoid a constitutional conflict. See NAACP, ¶ 64. None of these cases addresses the "savings construction" doctrine.

 NAACP, 2014 WT 98, ¶ 72.

 See Crawford, 553 U.S. 181; Burdick v. Takushi, 504 U.S. 428 (1992); Anderson v. Celebrezze, 460 U.S. 780 (1983).

 Compare San Antonio Indep. Sch. Disk v. Rodriguez, 411 U.S. 1, 132 n.78 (1973) ("[T]he right to vote, per se, is not a [federal] constitutionally protected right.") with Phelps, 144 Wis. at 14-15 ("[T]he right to vote is one .. . guaranteed by the declaration of rights and by section 1, art. 3 of the [Wisconsin] Constitution.").

 See also Justice Crooks' concurrence, ¶ 61 (determining that the claims in the instant case are "distinct from the challenge raised" in NAACP because the plaintiffs in NAACP "provided] a record with evidence of the Act's burden on individual Wisconsin residents").

 See Brief of Plaintiffs-Respondents-Petitioners at 38-39.

 The record in League of Women Voters also reflects financial and other costs that burden qualified electors' right to vote. See, e.g., Plaintiffs Amended Complaint, R22:7-9, ¶¶ 18-26; Affidavit of Michael McCabe, President of Wisconsin Democracy Coalition (alleging that various members of his organization will have their right to vote burdened by the photo identification requirements); Affidavit of Analiese Eicher, Government Relations Director, United Council of UW Students, (alleging that many universities and colleges do not have photo identification cards that comply with Act 23 and do not plan to produce such cards, and that this will prevent many students for whom student identification cards are primary identification from voting); Affidavit of Ingrid Thompson (alleging that individuals in the senior living facility that she directs will be unable to vote); Affidavit of Amy Mendel-Clemens in Support of Amicus Curiae Brief on Behalf of Dane County (alleging that replacement birth certificates are difficult or impossible to *412 obtain from certain states, and that California and Pennsylvania have not responded or do not respond to the forms used by Dane County).

 The distinction between a facial and an as-applied challenge is not always clear. Justice Crooks states the standard of review as follows: "The appropriate framework to analyze the plaintiffs' challenge to Act 23 is the modified facial challenge approach, which the United States Supreme Court has applied in comparable cases." NAACP, 2014 WI 98, ¶ 85 (Crooks, J., dissenting) (footnote omitted).
There is also confusion about the application of the "presumption of constitutionality" standard of review to a facial challenge or an as-applied challenge.
The majority opinion, ¶ 13, distinguishes between standards of review for facial and as-applied cases, quoting State v. Wood, 2010 WI 17, ¶ 13, 323 Wis. 2d 321, 780 N.W.2d 63). Compare Wood, 323 Wis. 2d 321, ¶ 15 (applying identical presumption of constitutionality to both facial and as-applied challenges), with Tammy W.-G. v Jacob T, 2011 WI 30, ¶¶ 46-48, 333 Wis. 2d 273, 797 N.W.2d 854 (citing Wood for the proposition that the presumption applies in as-applied challenges but that "we do not presume that the State applies statutes in a constitutional manner").

 Majority op., ¶¶ 15-17. See ¶¶ 115-136, supra.

 The first case invoking the "strict scrutiny" standard in evaluating Wisconsin constitutional rights that I can find is Town of Vanden Broek, Outagamie Cnty. v. Reitz, 53 Wis. 2d 87, 191 N.W.2d 913 (1971). No reported Wisconsin appellate case since that date other than the instant case and NAACP has raised a facial challenge to a state statute or regulation alleging that it violates Article III of the Wisconsin Constitution.

 The United States Supreme Court has similarly stated that before the right to vote "can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny." Dunn v. Blumstein, 405 U.S. 330, 336 (1972) (citing Evans v. Cornman, 398 U.S. 419, 422 (1970)).
The NAACP majority opinion at ¶ 22 describes its test as applying strict scrutiny if a "severe burden" exists on the right to vote, while the dissent in NAACP follows the language of the Anderson/Burdick test requiring balance between any burden on the right to vote and the state interests. NAACP, 2014 WI 98, ¶¶ 100-102 (Crooks, J., dissenting).
Furthermore, Wisconsin applies a strict scrutiny standard of review for First Amendment challenges. Courts have located the federal right to vote in the First Amendment right to freedom of speech. See Harper, 383 U.S. at 665 ("[T]he right to vote in state elections is implicit, particularly by reason of the First Amendment. . ..").

 Majority op., ¶¶ 25-32.

 Knowlton, 5 Wis. at 316 (emphasis added).

 Cothren v. Lean, 9 Wis. 254, 258-59 [*284] (1859).

 Dells, 49 Wis. at 557.

 Baker, 38 Wis. at 86.

 Id. at 89.

 See Phelps, 144 Wis. at 18; see also State ex rel. Wood v. Baker, 38 Wis. 71, 86 (1875) (holding that requiring some proof of identity prior to voting existed "not to abridge or impair the right, but to require reasonable proof of the right" and therefore holding proof of identity as constitutional).

 State ex rel. Frederick v. Zimmerman, 254 Wis. 600, 613, 37 N.W.2d 472 (1949).

 Id. at 618.

 Baker, 38 Wis. at 89.

 Act 23 does not fall into any of the five areas of law in which Article III, Section 2 of the Wisconsin Constitution authorizes the legislature to enact laws. It does not define residency. It does not provide for registration of voters. It does not provide for absentee voting. It does not exclude from suffrage persons convicted of a felony or adjudged incompetent. It does not extend the right of suffrage to additional classes.

 See Baker, 38 Wis. at 86.

 Wisconsin Admin. Code § Trans 102.15(4)(a) (Feb. 2013) allows one of the following as satisfactory proof of identity to obtain a photo ID:
(a) A supporting document identifying the person hy name and bearing the person's signature, a reproduction of the person's signature, or a photograph of the person. Acceptable supporting documents include:
2. A valid operator's license, including a license from another jurisdiction, except a province of the Dominion of Canada, bearing a photograph of the person;
Note: Temporary driving receipts from other jurisdictions are not acceptable. "Another jurisdiction" is defined at s. 340.01 (41m), Stats.
3. Military discharge papers (including certified copy of federal form DD-214);
4. A U.S. government and military dependent identification card;
5. A valid photo identification card issued by Wisconsin or another jurisdiction, except a province of the Dominion of Canada, bearing a photograph of the person;
11. A marriage certificate or certified copy of judgment of divorce;
Note: A testament to the marriage document does not satisfy this requirement.
13. A social security card issued by the social security administration;
Note: Metal or other duplicate Social Security Cards are not acceptable.
23. Any document permitted under sub. (3)(a), if it bears a photograph of the person and was not used as proof of name and date of birth.
Note: This permits a person to use two separate documents under sub. (3)(a) to satisfy the requirements of subs. (3) and (4).
24. Department of homeland security/transportation security administration transportation worker identification credential.

 In State ex rel. Wood v. Baker, 38 Wis. 71, 86-87 (1875), the legislation provided for a fail-safe mechanism. A qualified voter who failed to appear on the election registry could nonetheless furnish proof of his right to vote. "[P]roof of the right [to vote] . . . should not be a condition precedent to the right itself at the election, but failing the proof of registry [the legislature] left other proof open to the voter at the election, consistent with his present right."
In contrast with Act 23, in Michigan, a voter who does not have adequate photo identification is not required to incur the costs of obtaining photo identification as a condition of voting. The Michigan voter may simply sign an affidavit in the presence of an election inspector and does not incur any costs in the *427 execution of an affidavit. In re Request for Advisory Opinion Regarding Constitutionality of 2005 AP 71, 740 N.W.2d 444 (Mich. 2007).

 Knowlton, 5 Wis. at 316.

 Wis. Const, art. XII, §§ 1-2.

 See Phelps, 144 Wis. at 18.

 NAACP, 2014 WI98, ¶¶ 117-132 (Crooks, J., dissenting).

 See Dells, 49 Wis. at 557.

 "It would be a fraud on the constitution to hold [qualified electors] disenfranchised without notice or fault." Baker, 38 Wis. at 89.

 See Dells, 49 Wis. at 557.

 State ex rel. Van Alstine v. Frear, 142 Wis. 320, 341, 125 N.W. 961 (1910) (allowing legislative enactment of primary election ballot procedures).

 See Frederick, 254 Wis. at 613.

 See Baker, 38 Wis. at 89: "It would be a fraud on the constitution to hold [a voter whose name was not in the registry] disfranchised without notice or fault... . And it would be monstrous in us to give such an effect to the registry law, against its own spirit and in violation of the letter and spirit of the constitution."

 Baker, 38 Wis. at 86